JOHN A. CATALDO *vs.* MORTIMER B. ZUCKERMAN & another.[1]

Suffolk. June 7, 1985. — September 10, 1985.

Present: KASS, CUTTER, & FINE, JJ.

*Contract,* What constitutes, Performance and breach, Employment, Option, Waiver. *Evidence,* Expert opinion, Value.

A memorandum from a partner in a real estate development firm to a person employed by the firm as a construction expert, outlining certain elements of the employee's compensation, including a partnership interest in certain development projects, which had been prepared by the firm's two partners and signed by the three parties involved, and under which the parties acted for some six years thereafter, treating it as a contract, could properly be found to contain all the essential terms of a contract in a form sufficiently definite to be enforceable, even though some aspects of the transaction were left for later agreement. [737-738]

In an action by an employee against the partners in a real estate development firm from which he had been discharged, alleging that they had deprived him of benefits provided under a memorandum prepared by the partners and signed by the parties, including his share of the "developer's equity" in certain named projects and in future projects contemplated by the memorandum, the evidence warranted a conclusion that, when the plaintiff was discharged, the possibility that he would gain later a vested share of the developer's equity in each of the firm's projects then viable was sufficiently an "identifiable, future benefit . . . reflective of past services," and specifically related to such past services performed by him, to come within the principle set forth in *Fortune* v. *National Cash Register Co.,* 373 Mass. 96, 105-106 (1977), and that, therefore, the plaintiff was entitled to recover the fair value, at the time of his discharge, of his interest in the projects in question. [738-741]

On appeal by the defendants in an action by an employee against the partners in a real estate development firm from which he had been discharged, alleging that he had been deprived of benefits provided under a memorandum signed by the parties, including a partnership interest in certain development projects, it was held that the jury reasonably found that an option in the memorandum allowing the defendants to buy back the plaintiff's partnership interest, alleged by the defendants to constitute a

[1] Edward H. Linde.

maximum limit upon their liability to the plaintiff, was not exercised by the defendants within a reasonable time [742-743]; and that the defendants were not excused from a formal exercise of the buy-back option in the absence of evidence suggesting that the plaintiff would not have complied with his obligation under the option if a prompt exercise of the option had been made [744].

In an action by an employee against the partners in a real estate development firm from which he had been discharged, alleging that he had been deprived of benefits provided under a memorandum prepared by the partners and signed by the parties, including his share of the "developer's equity" in certain named projects and in future projects contemplated by the firm, the judge did not abuse his discretion in permitting a certified public accountant with extensive experience in analyzing proposed development investments to testify as an expert before the jury, under instructions to which no relevant objection was made, as to the fair market values of the plaintiff's interests in the developer's equities. [744-746]

In an action by an employee against the partners in a real estate development firm from which he had been discharged, alleging that he had been deprived of benefits provided under a memorandum prepared by the partners and signed by the parties, including an annual bonus of at least $10,000 as part of his over-all compensation, the jury could have reasonably found from the evidence that the parties never resolved the plaintiff's contention that he was entitled to recover $50,000 for bonus amounts not paid to him for five consecutive years, and that the memorandum had not been modified with respect to bonus payments. [746-747]

CIVIL ACTION commenced in the Superior Court Department on December 20, 1978.

The case was tried before *Alan J. Dimond, J.*

*Daniel L. Goldberg* for the defendants.

*Douglas G. Moxham (Kenneth R. Berman & Judith Gail Dein* with him) for the plaintiff.

CUTTER, J. In 1971, Zuckerman and Linde were partners in Boston Urban Associates (BUA), formed by them to develop real estate projects. Linde offered to Cataldo the job of supervising BUA's construction operations. Cataldo accepted and began work on August 2, 1971.[2]

---

[2] Cataldo theretofore had been a vice president of Aberthaw Construction Co. (Aberthaw), a subsidiary of Cabot, Cabot, & Forbes (C.C.&F.), where Zuckerman and Linde had observed him, before they left C.C.&F. to form

A memorandum (the 1971 memorandum) from Linde to Cataldo, dated September 17, 1971, but actually signed by Cataldo, Linde, and Zuckerman on November 3, 1971, "outlined . . . some of the items . . . discussed as elements of . . . [Cataldo's] overall compensation as long as . . . [Cataldo, Zuckerman, and Linde] continue to be associated in" BUA. These elements included "1. Base salary: $35,000 per year. . . . 2. Bonus: $10,000 or more as . . . [Cataldo, Zuckerman, and Linde] mutually agree upon a yearly basis."[3] Under the heading "6. Partnership Interests," it was provided that Cataldo "will own a portion of the '[d]eveloper's [e]quity'" in two named projects and in future projects developed by BUA. See subsections A, B, and C of par. 6 in note 4(b), *infra*. The paragraph proceeded, "'Developer's [e]quity' is . . . that portion of the entire equity remaining after any equity participation has been made for all outside financing or other interests; e.g., construction, brokerage or architectural fees paid in the form of equity participation, joint venture participations, etc."[4]

Under the heading "D. Partnership Provisions,"[5] the 1971 memorandum included the following: "(1) . . . [Zuckerman and Linde] will retain the unrestricted right to make all policy decisions with respect to partnership affairs," a provision made thoroughly inclusive by further language; and the provision

BUA. They decided to induce Cataldo to join them when they needed a construction expert. The jury in this case found in answer to a special question (see note 10, *infra*) that this was as an employee "at will."

[3] Then followed references to a company automobile, club membership, and charge cards, to be provided to Cataldo as needed.

[4] (a) Paragraph 6 then provided that "'[d]eveloper's [e]quity' shall be calculated after all management fees to related entities" in a manner which need not be stated here. (b) The projects were listed as follows: "A. Park Plaza: 5%. B. Swampscott: 10%. C. Future Projects: . . . [Cataldo's] share to be mutually agreed upon by . . . [Cataldo, Zuckerman, and Linde] in the range of 5% to 10%, depending upon the nature of the deal, . . . [Cataldo's] responsibilities within the project, and any other partners who may be included."

[5] The parties by these provisions of the 1971 memorandum apparently contemplated that a separate partnership would be formed for each project, and that the substance of these "partnership provisions" would be included in such partnership agreements, respectively.

referred to by the parties as the "buy-back" provision, "(2) In the event . . . [Cataldo's] employment by BUA is terminated during the development of the project in question for whatever reason, voluntarily or involuntarily . . . [with exceptions not here applicable], . . . [Zuckerman and Linde] will have the right to purchase back . . . [Cataldo's] partnership interest. The purchase price for . . . [that] interest would be based upon the lesser of a.) the appraised value of . . . [that] interest or b.) $1,000 per month times the number of months between the time the architect is authorized to begin preparation of design development drawings and the time . . . [Cataldo] leave[s], plus $1,000/month times the number of months by which this period exceeds 12 months. This purchase price would be paid off over a three year period."[6]

The 1971 memorandum was prepared by Linde and Zuckerman. The memorandum went through various drafts, one of which Cataldo admitted he saw.[7]

There turned out, for a time, to be less construction work for BUA than had been anticipated. Cataldo was not completely employed on that type of work.[8] Because BUA's operations encountered some fiscal problems, Cataldo received only one bonus payment, in 1972, and also was subjected in 1974 to a reduction to $25,000 of his basic salary of $35,000, which was partly restored (to $30,000) in 1976.

---

[6] Other provisions of paragraph D, tending to reinforce the "buy-back" provision, do not appear to be relevant in this case.

[7] Cataldo testified that he voiced only two objections to that early draft, viz., (a) to the then form of paragraph D(2) dealing with Cataldo's possible illness or incapacitation during a project, and (b) with respect to changing the beginning date of the formula for computing the purchase price of Cataldo's interest from the time the architect was authorized to begin preparation of "working drawings" to the usually earlier time when the architect was authorized to begin "design development drawings" on the particular project.

[8] Indeed, at one time Cataldo had so little construction work to do for BUA that he took on consulting work (with BUA's permission) and also offered to take an unpaid leave of absence until some of BUA's projects reached a construction stage. His offer, however, did not include the surrender by him of any developer's equity interest to which he was entitled under the 1971 memorandum.

Thereafter, Cataldo began pressing for the execution of a partnership agreement on each project in which he felt entitled to a share of the developer's equity. He engaged in discussions with Linde and Zuckerman, in which the latter two tried to persuade Cataldo to change the partnership arrangements for individual projects contemplated by the 1971 agreement. The defendants, among other changes, sought to substitute for Cataldo's shares of developer's equity other forms of participation in project profitability.

Cataldo, on August 29, 1977, by a memorandum to Zuckerman and Linde, brought matters to a head. He contended that the terms of the 1971 memorandum should be carried out and was "not willing to accept the various modifications" of that memorandum which had been suggested because they would deprive him "of the very long-range equity participation" which constituted the reason he had "entered the employ of BUA in the first place." As a consequence of Cataldo's memorandum, at a conference among Zuckerman, Linde, and Cataldo on August 29, 1977, Cataldo's employment by BUA was terminated.

This action for damages was initiated by Cataldo on December 20, 1978. In his complaint Cataldo alleged the existence of the 1971 memorandum and asserted that it was a contract of employment. He claimed that Linde and Zuckerman were in breach of their obligations under it by (1) their termination of Cataldo's employment "without cause and in bad faith," (2) their refusal to pay him the remainder of his 1977 salary, (3) their failure to pay him bonuses for the years 1972 through 1977, and (4) their failure to pay for depriving him of his share of the "[d]eveloper's [e]quity" in projects known as Commercial Block, Hayden Avenue, Mainstone Farm, and 133 Federal Street.[9]

---

[9] The complaint was later amended on April 14, 1983, to include, as projects in which Cataldo was to have a share of "[d]eveloper's [e]quity," Park Plaza and another project no longer under discussion. Zuckerman and Linde concede in their brief that they do not press any claim on appeal concerning the award made to Cataldo for 133 Federal Street, beyond a contention that the damages awarded were not supported by an enforceable

The case was tried before a Superior Court judge and a jury from December 5 to 22, 1983. At the close of Cataldo's case and at the close of all the evidence, Linde and Zuckerman moved for directed verdicts. The motions were denied, and the case was submitted to the jury on special questions.

The special questions were answered,[10] and judgment for Cataldo was entered on the basis of the answers.[11] The defendant's motions for judgment n.o.v., for a new trial, and for amendment of the findings and entry of additional findings were denied on February 15, 1984. The defendants have appealed.

---

contract (see discussion in part 1 of this opinion). The Swampscott project mentioned in the 1971 memorandum (see note 4[b], *supra*) was abandoned by BUA and no question now exists with regard to it.

[10] The still relevant jury answers follow. (1) The defendants on August 29, 1977, owed Cataldo no amount for back salary but (3) and (4) did owe him $50,000 for back bonuses not paid. (5) On August 29, 1977, Cataldo was employed by BUA at will (and not on an annual basis). (7) The defendants discharged Cataldo (i.e., he did not resign or leave by mutual agreement). (9) and (10) Cataldo on August 29, 1977, was entitled to equity interests in the projects listed in note 11, *infra*, which interests had the fair market values, respectively, on that date, of the amounts set forth in note 11, *infra*. (12) Only 133 Federal Street (see note 11, *infra*) was substantially completed on August 29, 1977. (13) and (14) The defendants did "fire" Cataldo "for the purpose of preventing him from receiving a vested equity interest, at a later date, in" each of the projects listed in note 11, *infra*. A vested interest was defined in Question 13 as "an equity interest in a substantially completed project" which "would therefore not be subject to the buy-back provision in the 1971 memorandum." (15) and (16) Design development drawings were authorized for Mainstone Farm in January, 1976, Commercial Block in January, 1977, and Hayden Avenue in June, 1977. (17) The value placed by the defendants on Cataldo's interest in Mainstone Farm in their letter of April 5, 1978 was not presented in good faith. (18) The defendants' attempted exercise of the buy-back option on April 5, 1978, was not within a reasonable time after August 29, 1977.

[11] The judgment included not only recovery of $50,000 for back bonuses but also the following awards for the fair market value on August 29, 1977, of Cataldo's developer's equity interests in the following projects: Park Plaza, $180,000; 133 Federal Street, $100,000 (see note 9, *supra*); Mainstone Farm, $56,000; Commercial Block, $44,000; Hayden Avenue, $6,500. The jury set each of these values at the same amount regardless of whether they took into account or did not take into account the buy-back provision of the 1971 memorandum.

1. The defendants contend that the 1971 memorandum was too vague and preliminary in nature to be enforced as a contract among the persons who signed it. See *Saxon Theatre Corp.* v. *Sage,* 347 Mass. 662, 666 (1964); *Blair* v. *Cifrino,* 355 Mass. 706, 707-710 (1969); *Tull* v. *Mister Donut Dev. Corp.,* 7 Mass. App. Ct. 626, 631-632 (1979). Cataldo, on the other hand, takes the position that the 1971 memorandum embodied all the material terms of the arrangement under which Cataldo was to work for BUA, with provisions sufficiently specific to control their relationship, even if some aspects of the transaction were left for later agreement. See *Sands* v. *Arruda,* 359 Mass. 591, 594-597 (1971); *Roddy & McNulty Ins. Agency, Inc.* v. *A. A. Proctor & Co.,* 16 Mass. App. Ct. 525, 530-533 (1983); *Frank Horton & Co.* v. *Cook Elec. Co.,* 356 F.2d 485, 490 (7th Cir.), cert. denied, 384 U.S. 952 (1966). See also *Air Technology Corp.* v. *General Elec. Co.,* 347 Mass. 613, 626 n.17 (1964); Restatement (Second) of Contracts §§ 33 & 34 (1981).

We conclude that the 1971 memorandum contained "[a]ll the essential terms of a contract" in a form "sufficiently definite so that the nature and extent of the obligations of the parties can be ascertained." *Simons* v. *American Dry Ginger Ale Co.,* 335 Mass. 521, 523, see 523-524 (1957), and cases cited. The parties acted under the 1971 memorandum for some six years and treated it as a contract. All of them signed it, showing an intention to be bound by its provisions. Uncertainty about the terms of the 1971 memorandum arose only when BUA's partners showed unwillingness to abide by the 1971 provisions, when asked by Cataldo to formulate partnership arrangements for the Park Plaza project and for each of four projects which, by 1977, appeared viable. We are of opinion that the formulae set out in the 1971 memorandum gave adequate guidance for stating the several required partnership arrangements,[12] at least

---

[12] The context in which the parties dealt with each other is relevant in considering the adequacy of the 1971 memorandum. It would have been difficult in 1971 to frame any more precise statement of the inducements which had been offered to Cataldo to cause him to leave Aberthaw (see note 2, *supra*). Cataldo's interest in the developer's equity of each partnership was fixed either at 5% (Park Plaza), or (future projects) at a minimum of 5%.

between BUA and Cataldo. This could have been done with considerable flexibility left to BUA's two partners to deal with other aspects of each project partnership as the needs of that partnership might require.

2. The 1971 memorandum gave Cataldo (as consideration for his leaving Aberthaw [see note 2, *supra*] and for his continuing to work for BUA) a total compensation measured by all the elements mentioned in that memorandum as base salary, bonuses, perquisites, and partnership interests. Cataldo, under the 1971 memorandum, could have been found entitled to have the defendants work out with him a partnership arrangement to protect his share of developer's equity (a) then as to Park Plaza, in existence in 1971, if determined to be likely to be completed, and (b) as to each new project within a reasonable time after it had made enough progress to indicate a likelihood of completion. The defendants negotiated with Cataldo about such partnership arrangements in 1976 and 1977. It could be found, however, that the defendants then attempted to alter important provisions of the 1971 memorandum in a manner which Cataldo thought to be to his disadvantage. They discharged him when he insisted on his position, although he had continued to perform his obligations under the 1971 memorandum.

This discharge perhaps could have been regarded as part of a simple breach of the defendants' 1971 contract to enter into suitable partnership arrangements. For such a breach, Cataldo might be found to be entitled, upon usual contract principles,[13]

---

[13] The trial judge at bench conferences suggested that this case could be dealt with on contract principles without resort to the holdings in *Fortune* v. *National Cash Register Co.,* 373 Mass. 96 (1977), discussed later in this opinion. He referred to the possible analogy of a real estate brokerage transaction where a broker has done much work on a deal and is prevented from earning his commission by action taken by the seller in bad faith. See *Elliott* v. *Kazajian,* 255 Mass. 459, 462-465 (1926). See also *RLM Assocs.* v. *Carter Mfg. Corp.,* 356 Mass. 718 (1969), and, on prevention of the happening of conditions, 3A Corbin, Contracts, §§ 767-770 (1960 & Supp. 1984).

to what he had lost as a consequence of the breach; viz., at least with respect to the developer's equity interests, the then fair value of these lost interests.

This case, however, was not dealt with only as a simple breach of contract. It also took into account the decision in *Fortune* v. *National Cash Register Co.*, 373 Mass. 96, 105-106 (1977). On the evidence in that case, the court held a finding to be warranted that the company's discharge of a salesman, employed "at will," was in bad faith, where it had occurred shortly after a sale of company merchandise which would have entitled the salesman to certain credits. Recovery by the salesman of these bonus credits (*id.* at 101 n.7) was allowed. The court there relied upon the principle (*id.* at 102-103) "that parties to contracts and commercial transactions" are bound by the standard of "[g]ood faith and fair dealing between [the] parties."

The *Fortune* case, in aspects here relevant,[14] thus far has been applied principally to discharges in bad faith of an employee serving at will with the purpose of depriving that employee of *already earned* commissions, compensation, or other benefits, essentially based on past services. See *Gram* v. *Liberty Mut. Ins. Co.* (hereafter "Gram I"), 384 Mass. 659, 670-674 (1981), where the authorities are collected and carefully analyzed; *Maddaloni* v. *Western Mass. Bus Lines*, 386 Mass. 877, 881-884 (1982);[15] *Gram* v. *Liberty Mut. Ins. Co.* (hereafter

---

[14] Some applications of the *Fortune* decision have no pertinence to the present case. It is not contended that Cataldo was discharged for any reason that offends any public policy. See *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 668 n.6 (1981); *Cort* v. *Bristol-Myers Co.*, 385 Mass. 300, 303-307 (1982). Compare *Melley* v. *Gillette Corp.*, 19 Mass. App. Ct. 511, 512-514, further appellate review granted, 395 Mass. 1101 (1985). There also appears to be no persuasive contention that Cataldo was discharged for cause.

[15] See also, as to the *Fortune* decision, *Kravetz* v. *Merchants Distributors, Inc.*, 387 Mass. 457, 461 (1982); Schreiber, Wrongful Termination of At-Will Employees, 68 Mass.L.Rev. 22 (1983). See also *RLM Assocs.* v. *Carter Mfg. Corp.*, 356 Mass. 718 (1969), cited in the *Fortune* case, 373 Mass. at 103. Compare *Zapatha* v. *Dairy Mart, Inc.*, 381 Mass. 284, 298-300 (1980); *Manning* v. *Zuckerman*, 388 Mass. 8, 9-12 (1983, involving

"Gram II"), 391 Mass. 333, 334-335 (1984). In *McCone* v. *New England Tel. & Tel. Co.*, 393 Mass. 231, 233-235 (1984), the Supreme Judicial Court recognized that *Gram II* had limited the applicability of the *Fortune* principle where a breach of the implied covenant of good faith and fair dealing in an "at will" employment contract operated to deprive the employee not of an "identifiable, future benefit . . . *reflective of past services*" (emphasis supplied), but of credits or benefits which constituted "*future* compensation for *future* services" (emphasis supplied) not "specifically related to a particular past service." See the *McCone* case, 393 Mass. at 234-235; *Gram II*, 391 Mass. at 334 & n.1. See also *Tenedios* v. *Wm. Filene's Sons, ante* 252, 254-255 (1985).

We interpret the 1971 memorandum as providing Cataldo, by his share of developer's equity interests in the then existing Park Plaza and in "future projects," part of his compensation for particular past services. As has been stated, all his benefits under the 1971 memorandum were to be "elements of . . . [Cataldo's] overall compensation as long as . . . [the signers] continue[d] to be associated in" BUA. The project equity interests in Park Plaza and in future projects (as they did develop) provided him with a continuing inducement to work for BUA, and were part of the compensation for that continuing work, at the salary stated in the 1971 memorandum as well as to suffer pay reductions during a depressed period, and to postpone bonus payments. Actual realization by Cataldo of the value of any share of the developer's equity was for the future, of course, but ownership of the possibility was intended to be and was part of Cataldo's day-to-day compensation for work currently being done. When prevented (by a discharge found by the jury to have been in bad faith) from realizing the developer's equity interests, Cataldo's injury, as to them, could

one of the present defendants); *Gerald Rosen Co.* v. *International Tel. & Tel. Co.*, 16 Mass. App. Ct. 929 (1983). Compare also *Richey* v. *American Automobile Assn.*, 380 Mass. 835, 839 (1980); *Balzer/Wolf Assocs.* v. *Parlex Corp.*, 753 F.2d 771 (9th Cir. 1985), a two-to-one decision applying Massachusetts law.

be measured by the value of these interests at the time of his discharge.

We conclude that, when Cataldo was discharged, the possibility that Cataldo would gain later a vested share of the developer's equity in each BUA project then viable was sufficiently an "identifiable, future benefit . . . reflective of past services" (*Gram II*, 391 Mass. at 334; and the *McCone* case, 393 Mass. at 235), and specifically related to such past services performed by Cataldo, to come within the principle of the *Fortune* case. We recognize, of course, that the precise limits of the doctrine of that case are not free from doubt.

The trial judge, correctly we think, instructed the jury that, as to any given project, the questions for their determination were (a) whether the project was the sort of project in which the parties to the 1971 memorandum intended that Cataldo should have an interest, regardless of its then state of completion;[16] (b) that such a "project must have been one in which . . . Cataldo had significant responsibilities" and "had already done a significant amount of work, with a reasonable expectation that the work would continue . . . to the completion of the project"; and (c) that the project must "have gone beyond the stage of a mere hope or prophecy or preliminary and tentative creation" and have had "a reasonable possibility of continuing on to completion." This language sufficiently related Cataldo's share of developer's equity to work already done by him.[17]

---

[16] The jury justifiably found (see note 10, *supra*) that design development drawings had been authorized for each of the Mainstone Farm, Commercial Block, and Hayden Avenue projects before Cataldo's discharge on August 29, 1977. There was evidence that would permit a finding that such drawings for Park Plaza had existed when Cataldo started work for BUA in 1971.

[17] The judge also instructed, with respect to Cataldo's discharge, that the jury was required to determine whether the defendants had discharged Cataldo "for the purpose of preventing him from receiving a vested equity interest at a later date" in the project when substantially completed, and that the defendants' intent "to cut . . . [Cataldo] out of . . . a vested equity interest in . . . [a] project when substantially completed" must be "a conscious, deliberate intention" on the date of Cataldo's discharge, that is, "the major or the principal reason for discharging him." This was perhaps a more favorable instruction than Linde and Zuckerman were entitled to have

3. Linde and Zuckerman contend that, even if the *Fortune* case principle applies to their discharge of Cataldo, the buy-back provision imposes a maximum limit upon their liability to Cataldo with respect at least to the Mainstone Farm, Commercial Block, and Hayden Avenue projects. The buy-back provision is certainly an option, for the language allows, but does not require, Linde and Zuckerman to take advantage of the provision. We decide only that the jury reasonably found no exercise of that option within a reasonable time.

Only two documents are relied upon by Linde and Zuckerman as an exercise of the buy-back option. The first was a letter dated September 8, 1977, from Linde to Cataldo. That letter (1) purported to confirm the termination of Cataldo's employment by BUA as of August 29, 1977, i.e., "to terminate . . . all business or legal relationships," and (2) referred to the buy-back option only in general terms and stated that Cataldo well knew that "none of the [BUA] development projects . . . [had] any value as of August 29, 1977." It made no reference to any exercise of the option. The trial judge correctly concluded that the letter could not be viewed reasonably as an exercise of the option.

The second letter relied on as an exercise of the buy-back option, dated April 5, 1978, was sent by the defendants' then attorney to Cataldo's then attorney. The letter purported to exercise for Zuckerman and Linde the buy-back option with respect to three projects as indicated in the margin.[18] As to

---

under the *Fortune* decision. See the *Maddaloni* case, 386 Mass. at 882 n.4. Compare *Siles* v. *Travenol Laboratories, Inc.*, 13 Mass. App. Ct. 354, 358-359 (1982).

[18] The following option figures were mentioned in the letter of April 5: *Commercial Block* for one dollar (asserting that the project had no value as of August 29, 1977, and, incorrectly as the jury found, that no architect had been authorized to proceed with design development drawings); *Hayden Avenue* for $2,000, on the basis that no more than two months had elapsed by August 29, 1977, from the time the architect was authorized to proceed with design development drawings; *Mainstone Farm* for one dollar (asserting that the project had no value as of August 29, 1977, although over one million dollars had been invested in the project without the required approvals having been obtained).

Park Plaza, the letter of April 5 understandably made no exercise of the buy-back option.[19]

The jury on special questions (see note 10, *supra*) decided that the defendants' exercise on April 5, 1978, of the buy-back option with respect to the Mainstone Farm, Commercial Block, and Hayden Avenue projects was not "within a reasonable time after August 29, 1977." The judge, in dealing with the defendants' posttrial motions, was of opinion that the defendants' breach of their obligation to produce "partnership agreements embodying . . . [Cataldo's] equity interests" rendered the buy-back option irrelevant. See the *Fortune* case, 373 Mass. at 101; *Steranko* v. *Inforex, Inc.*, 5 Mass. App. Ct. 253, 266-267 (1977), *S.C.* after remand, 8 Mass. App. Ct. 523 (1979). In any event, the judge did not disturb the jury's determination that the exercise of the buy-back option on April 5, 1978, was not within a reasonable time.[20]

---

[19] The Park Plaza project had been abandoned by BUA between August 29, 1977, and April 5, 1978. The defendants purported to call upon Cataldo to pay his five percent share of BUA's asserted investment of $1,789,809 in Park Plaza.

[20] That the judge let the jury finding stand disposes of the matter, even if he erred in concluding that "reasonable time" was a question of fact for the jury. The question whether the buy-back option was exercised within a reasonable time, see *Delano Growers' Coop. Winery* v. *Supreme Wine Co.*, 393 Mass. 666, 675 (1985), involved a number of complicated issues and possible inferences of fact, and not merely a simple determination on facts not disputed. See and compare *Powers, Inc.* v. *Wayside, Inc.*, 343 Mass. 686, 691 (1962). It thus was peculiarly appropriate for decision by the fact finder, here the jury. See *MacDonald & Payne Mach. Co.* v. *Metallic Arts of New England, Inc.*, 324 Mass. 353, 357 (1949); *City Welding & Mfg. Co.* v. *Gidley-Eschenheimer Corp.*, 16 Mass. App. Ct. 372, 373 (1983); *Flagship Cruises, Ltd.* v. *New England Merch. Natl. Bank*, 569 F.2d 699, 702 (1st Cir. 1978), where it was said that the "reasonableness of a period of time — except as to extremes — would seem to be a classic issue for the trier of fact." Compare *Warren* v. *Ball*, 341 Mass. 350, 352-354 (1960), a bailment case where there was "no reason for either party to have expected a demand for" the return of the bailed articles within the period of the statute of limitations and where the issue of the timeliness of a demand had been submitted to the jury and its decision was sustained; *Barclay* v. *DeVeau*, 384 Mass. 676, 684-686 (1981), where the case was remanded for a statement of the criteria employed by the trial judge (apparently the fact finder) in determining a reasonable time.

4. The defendants were not excused from a formal exercise of their buy-back option with respect to the three projects (other than Park Plaza) incomplete on the day of Cataldo's discharge. No evidence suggests that Cataldo would not have complied with his obligation under the option if a prompt exercise of the option had been made. We perceive no room on this record for the application of *Leigh* v. *Rule*, 331 Mass. 664, 668-669 (1954).

It is true that Cataldo (a) in early pleadings, did not claim deprivation of an interest in the Park Plaza project, and (b) immediately before his discharge, stated that he had "a 5% interest [in that project], but at the present time there is no value to this interest." The latter statement, however, was offset by the accompanying words "that in the long run . . . this 5% interest will be a valuable interest . . . ." Cataldo amended his pleadings accordingly (see note 9, *supra*). We think Cataldo did not purport, by any position he took, to modify any interest which he could claim under the 1971 memorandum in a manner which would excuse the defendants from a formal exercise (within a reasonable time) of their buy-back option.[21]

5. The defendants objected to the testimony of Joseph De-Franco, called by Cataldo as an expert witness on the value of Cataldo's shares of the developer's equity in the Park Plaza, Mainstone Farm, and Commercial Block projects. DeFranco was a certified public accountant with extensive experience with a large national accounting firm and in his own later formed firm. He had worked on problems of "tax shelters" and real estate partnerships and had gained considerable experience in analyzing proposed development investments. He himself has been the head of a development partnership. The trial judge ruled that DeFranco was qualified to testify on the fair market values of Cataldo's interests in the developer's equities in this litigation. A continuing defense objection to DeFranco's testimony was noted by the judge.

---

[21] See as to statements which may constitute evidentiary admissions *General Elec. Co.* v. *Assessors of Lynn*, 393 Mass. 591, 603 (1984); Liacos, Massachusetts Evidence 275-276 (5th ed. 1981).

DeFranco was subjected to a long, intensive, and able cross-examination which, so the defendants contend, exhibited serious lack of familiarity on the part of the witness with various obstacles which remained to be confronted in each of the three projects and which might affect the value of the developer's equity in each of them.[22] His testimony disclosed very completely his reasoning, theories of appraisal, and the material on which he relied and that which he disregarded.

The problem of placing a value upon the developer's equity interests of which Cataldo was deprived by his discharge on August 29, 1977, was obviously difficult. The value of those interests was very uncertain, yet the interests could be found to have significant value to Cataldo and others. The expert was not operating in an area where there had been established well-recognized principles of valuation. Compare *Young Men's Christian Assn.* v. *Sandwich Water Dist.*, 16 Mass. App. Ct. 666, 672-677 (1983). The expert's conclusions, almost necessarily, must amount to reaching a "judgment" figure.

The jury, of course, were not bound to follow only the expert testimony. They could consider all the other voluminous evidence about the several projects, and could properly reach a reasonable figure for each interest either above or below any figure set by any expert. See *Loschi* v. *Massachusetts Port Authy.*, 361 Mass. 714, 715-716 (1972). As was said in that case, "the jury learned considerable . . . information as to the nature of the property [here the developer's equity interests] from the [expert's] testimony . . . ." *Id.* at 716. We have no doubt that DeFranco's testimony in fact did "help the jury understand issues of fact beyond their common experience." *Simon* v. *Solomon*, 385 Mass. 91, 105 (1982).

---

[22] DeFranco admitted uncertainty and some ignorance about various aspects of the practice and regulations of the Boston Redevelopment Authority, about parts of the long history of BUA's efforts to get the necessary government approvals of the Park Plaza project, and about regulations affecting the Commercial Block project. He also, in stating reasons for his opinion about Park Plaza, used analyses which could have been found seriously to lack clarity and even to involve mathematical inconsistencies and errors.

The trial judge did not permit DeFranco's testimony to remain before the jury by mere inadvertence. He considered the matter, not only during trial, but also before denying the defendants' posttrial motions. He had broad discretion to determine that DeFranco was qualified as an expert in the area under discussion and to leave the defendants to rely on cross-examination to disclose weaknesses in his opinions which might destroy those opinions or affect their weight. See *Johnson* v. *Lowell,* 240 Mass. 546, 549-550 (1922); *Campbell* v. *Thornton,* 368 Mass. 528, 541 (1975); *Coleman* v. *DeMinico,* 730 F.2d 42, 45-47 (1st Cir. 1984), and cases cited in Liacos, Massachusetts Evidence 110-117, 118-120 (5th ed. & Supp. 1985). See also *Keating* v. *Duxbury Housing Authy.,* 11 Mass. App. Ct. 934 (1981); *Grossman* v. *Waltham Chem. Co.,* 14 Mass. App. Ct. 932, 933 (1982).

The members of this panel might have viewed DeFranco's testimony with more skepticism than did the jury. We cannot say, however, that the judge (who heard and saw the witnesses and was aware of the many difficulties of the case) did not act reasonably. There was no abuse of discretion in permitting DeFranco's testimony[23] to be considered by the jury under instructions to which no relevant objection was made.

6. The defendants argue that Cataldo was not entitled to recover $50,000 for bonus amounts not paid to him for the

---

[23] We recognize the force of criticism of DeFranco's testimony that on August 29, 1977, Cataldo's interest in the Park Plaza developer's equity was worth $180,000, a value accepted by the jury (see notes 10 and 11, *supra*), when it is undisputed that BUA abandoned the project in November, 1977, with a complete loss of its very substantial investment. DeFranco, however, was entitled, among other matters, to give weight to the circumstance that Zuckerman's record as developer had caused him, as DeFranco testified, to be "viewed in the community as a financial genius." This was a basis for DeFranco's view that there would have been a "scramble" of wealthy persons (who could afford the risks often inherent in "tax shelters") to buy a share of the developer's equity of Park Plaza, in which Zuckerman had already invested $1.8 million. The viability of the Park Plaza project in late August, 1977, could be considered by the jury in the light of an exhibit showing that, as late as June 6, 1977, in writing to a local zoning board about another project, Linde had said that the Park Plaza project "has finally reached a point where development is expected to begin within the next 12 months."

years 1973 to 1977. The 1971 memorandum provided for an annual bonus of at least $10,000 as part of Cataldo's "overall compensation." It was implied (as the judge found in denying posttrial motions) "that on each yearly anniversary of the [employment] relationship, the defendants would pay . . . [Cataldo] a $10,000 bonus, or . . . would act in good faith in deciding the question."[24]

The 1971 memorandum was never modified with respect to bonus payments. Cataldo reasonably could have felt justified in trusting the partners of BUA (a) to deal fairly with him as rapidly as was feasible, and (b) to treat the bonuses as only deferred to a time when they could afford to pay them. In any event, Cataldo did not press the defendants on the bonus issue. The jury could find reasonably that there never was any resolution of the unpaid bonus matter, and that the 1971 memorandum was not modified in this respect. See *Zampatella* v. *Thomson-Crooker Shoe Co.*, 249 Mass. 37, 38-39 (1924). See also *Attorney Gen.* v. *Woburn*, 317 Mass. 465, 467-468 (1945). Compare *Gebhard* v. *Royce Aluminum Corp.*, 296 F.2d 17, 18-19 (1st Cir. 1961, where it appeared that certain changes in commission rates were actually the subject of discussion between an employer and a discharged salesman, so that the latter had before him the "alternatives . . . to accept the new conditions or quit").

> *Order denying motion for*
> *new trial affirmed.*
>
> *Judgment affirmed.*

---

[24] When, in 1974, Cataldo agreed to a reduction in salary because of the then current "strain on the cash flow of" BUA, he had expressed the hope "that the period would be very short." Cataldo testified that Zuckerman had thanked him and said, "I'll make it up to you."