**Wayne H. SARGENT,**

v.

**TENASKA, INC.**

**Civil Action No. 94–30014–MAP.**

United States District Court,
D. Massachusetts.

Feb. 14, 1996.

Thomas P. Billings, Sally & Fitch, Boston, MA, for Wayne H. Sargent.

Stephen B. Deutsch, Foley, Hoag & Eliot, Boston, MA, for Tenaska, Inc.

### MEMORANDUM REGARDING MOTIONS FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION TO STRIKE

(Docket Nos. 29, 34 & 53)

PONSOR, District Judge.

### I. INTRODUCTION

Plaintiff filed his original four-count complaint on January 19, 1994. Count I alleges breach of contract, Count II specific performance, Count III common law fraud and Count IV a violation of the Massachusetts consumer protection statute, Mass.Gen.L. ch. 93A. Jurisdiction is based on diversity of citizenship.

Plaintiff has filed a motion for partial summary judgment on Count I and a motion to strike. Defendant has moved for partial summary judgment on parts of Counts I and II and all of Counts III and IV. This memorandum will address these three motions.

### II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of producing affirmative evidence to support its claim, or exposing the absence of proof to support the opposing party's claim. If the moving party meets this burden, the nonmoving party must go beyond the pleadings to demonstrate a genuine issue for trial. The court must evaluate all of the evidence in the light most favorable to the nonmoving party. See McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir.1995).

### III. FACTUAL BACKGROUND

The following facts, viewed at this point in the light most favorable to the plaintiff, are assumed to be true for purposes of these motions. Key disputes will be highlighted.

Defendant Tenaska, Inc. ("Tenaska" or "the company") is in the business of developing independent generation and co-generation power plants, as well as buying and selling natural gas.

In a letter dated May 1, 1990, Tenaska asked plaintiff Wayne H. Sargent ("Sargent") to open and manage a regional office in Massachusetts. The company offered Sargent a salary of $7,250 per month and participation in the company's bonus and pension plans. Additional compensation took the form of an employee ownership plan, proposed in the following terms:

An ownership interest of 1.50% in Tenaska, Inc., Lee Mass Cogeneration Company, Tenaska Gas Company and in any entities

created for new projects and formed by Tenaska subsequent to your employment start date will be made available to you beginning twelve months following employment, under the terms and conditions of an employee stock ownership plan to be implemented in 1990. The details of this plan, which will include vesting, are still being worked out by the company management, its attorneys and accountants.... The employee ownership plan will include a right of company to buy back the ownership interests of terminated employees under specified terms and conditions that will penalize short-term employment and reward performance and long-term accomplishments.

The letter also included the following proviso: "This offer of employment does not constitute an employment contract or a binding obligation on the company to employ you for any duration of time." Sargent signed the letter on May 5, 1990.

Sargent began work at Tenaska in May 1990. Over the course of his employment, he received interests in several Tenaska-related entities. Specifically, in May 1991 and February 1992, Sargent received 1.5% ownership interests, in Tenaska Marketing, Inc., Tenaska Washington, Inc., and Tenaska Washington I, L.P.[1]

On August 10, 1992, Sargent received a memorandum from Gary Hoover (vice president of Tenaska) explaining that the May 1, 1990 letter did not contemplate Sargent's receipt of stock in Tenaska Marketing, Inc., and in order to "balance the situation," he would receive only a 0.75% "performance share" in Tenaska Gas Company. The memorandum further explained that future distributions of interests less than 2% in Tenaska-related entities would be made pursuant to a "performance sharing plan," rather than an ownership interest. Hoover ended the memorandum by asking Sargent to "indicate your understanding and acceptance of the above changes ... by signing in the space below and returning one original to me."

Plaintiff's reaction to the August 1992 memorandum is a matter of sharp dispute. Defendant's witnesses say that shortly after he received the memorandum, Sargent spoke with Ronald Quinn (CFO of Tenaska), who explained the reasons for the changes. Quinn stated in deposition that after some discussion Sargent "understood the new arrangements." Sargent then "revisited the issues" in an April 1993 meeting with Larry Pearson (who had replaced Hoover as Sargent's supervisor) and Quinn. At that meeting, the company contends, Sargent said he would sign the memorandum. In another April 1993 meeting with Howard Hawks (president of Tenaska) and Pearson, defendant says Sargent "reiterated his willingness" to sign the memorandum, but Hawks told him that his signature was unnecessary.

Sargent takes a very different view of events following his receipt of the August 1992 memorandum. He claims that he immediately called Hoover to express his disagreement with the new terms. He also states that in April 1993 he told Hawks that he would "reserve judgment" on the performance sharing plan until the company produced formal plan documents for his review. In addition, Sargent claims, Hawks told him to ignore the proposal to reduce his interest in Tenaska Gas Company, adding that the memorandum "should never have been written."

In late 1993, Tenaska began making plans to close the Massachusetts regional office. In a December 22, 1993 memorandum, the company offered Sargent a new assignment in Omaha, subject to the following terms:

Your interests in Tenaska Gas Co. and [Tenaska Washington II, L.P.] will be as a participant in the respective performance plans. Your percentage interest will be .62% (subject to dilution) in each of the plans. Future interests in projects will be based solely on your performance with no guarantee of any future participation.

The memorandum stated that if Sargent declined the Omaha position, he would be terminated on January 16 and receive "stock in

1. These interests were subject to terms describing the company's limited buy-back option and possible ownership dilution (as additional employees received shares), which are not relevant to these motions.

Tenaska Gas Co. and [Tenaska Washington II, L.P.] per your employment letter."

Sargent told the company that he would accept the Omaha position, *if* Tenaska agreed to tender 1.5% ownership interests in Tenaska Gas Company and Tenaska Washington II, L.P. The company rejected these terms.

On January 16, 1994, Tenaska fired Sargent. Three days later, on January 19, Sargent filed this action, alleging that Tenaska terminated his employment in order to deprive him of certain ownership interests.

In June 1994, Tenaska tendered approximately 0.63% performance interests in Tenaska II, Inc., Tenaska Gas Company, and Tenaska Washington II, L.P. The Tenaska Gas Company interest came with a "performance interest date" of August 1, 1992.

Sargent has challenged the tender of approximately 0.63% performance interests in Tenaska II, Inc., Tenaska Gas Company, and Tenaska Washington II, L.P. He also contests Tenaska's failure to offer him any interest in Tenaska, Inc. and Lee Mass Cogeneration Company. With respect to all of these entities, Sargent claims that the company owed him 1.5% ownership interests, subject to dilution and vesting.[2]

## IV. *DISCUSSION*

### A. *Threshold Issues*

■ As a preliminary matter, the court must determine what law applies, using Massachusetts choice of law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). Massachusetts courts apply the law of the state with the "most significant relationship" with the suit. *Brennan v. Carvel Corp.*, 929 F.2d 801, 806 (1st Cir.1991). Sargent, a Massachusetts resident, received and signed Tenaska's offer of employment in Massachusetts. Moreover, he was hired to establish and supervise a regional office in this Commonwealth. For these reasons, the court concludes that Massachusetts has the "most significant relationship" with this case, and Massachusetts law will therefore apply.

A second threshold issue concerns the existence of an employment contract. Sargent argues that the parties bound themselves to the terms of the May 1, 1990 letter. Tenaska asserts otherwise.

On its face, the May 1, 1990 letter indicates that "[t]his offer of employment does not constitute an employment contract or a binding obligation on the company to employ you for any duration of time." This language, both sides agree, established an at-will arrangement, allowing employer or employee to terminate their relationship at any time, without cause.

■ A contract-at-will, however, may contain binding terms that are effective during the life of the contract. As the SJC noted, "Even if the contract is construed as terminable at will for the future by either party on reasonable notice, that does not necessarily make the contract illusory and unenforceable with respect to any period prior to such a termination." *Simons v. American Dry Ginger Ale Co.*, 335 Mass. 521, 525, 140 N.E.2d 649 (1957) (citations omitted). Indeed, so long as an employment relationship exists, employer and employee may have strong reasons to define its terms.

■ Such was the case here. Tenaska made an offer to Sargent on May 1, 1990, which he accepted several days later. While the agreement between them did not bind the defendant to employ plaintiff for any specified length of time, its terms defined the parties' rights so long as plaintiff remained on the job. The court will therefore regard the letter as a bilateral contract effective until one or both parties terminated the employment relationship.

■ Lastly, Sargent objects to any reference to Quinn's statement that he (Sargent) "understood the new arrangements" described in the August 10, 1992 memorandum. In the context of a conversation dedicated to a discussion of that memorandum, however, it cannot fairly be said that Quinn is incompetent to testify on his perception of Sargent's acceptance of the new terms. This conclusion does not make Quinn a mind read-

**2.** *See* n. 1, *supra.*

er; it merely recognizes that Quinn may testify to his observations based on what he witnessed plaintiff say and do. Therefore, plaintiff's motion to strike will be denied.

### B. *Count I: Breach of Contract and Breach of Duty of Good Faith and Fair Dealing*

Sargent's breach of contract claim presents a Janus face, focusing on two distinct issues, one facing to the past, the other to the future. The first is whether Tenaska failed to offer Sargent ownership interests in certain Tenaska-related entities, as required by the employment contract for past performance on the job. The second is whether Tenaska terminated Sargent in order to deprive him of certain interests that would vest in the future, in violation of its duty of good faith and fair dealing.

Sargent has directed his motion for partial summary judgment at the backward-facing first issue, arguing that the undisputed facts show that Tenaska failed to provide the agreed-upon ownership interests (or any interests whatever) in several Tenaska-related entities, that he was entitled to. On this motion, Tenaska's defense is that disputed issues of fact cloud the resolution of the question of just how much plaintiff is owed.

Tenaska has directed its motion at the forward-facing second issue, asserting that in light of the undisputed facts and applicable law Sargent cannot show that Tenaska breached the implied covenant of good faith and fair dealing by terminating Sargent to avoid its obligation to pay future benefits. Plaintiff defends against this motion by asserting that his future rights were sufficiently vested to give him a cause of action for breach of this covenant under controlling Massachusetts law. Each motion will be addressed in turn.

### 1. *Sargent's Motion*

Sargent argues that Tenaska breached its contract with him by failing to provide 1.5% ownership interests in five Tenaska-related entities. With respect to four of these—Tenaska, Inc., Tenaska II, Inc., Tenaska Gas Company, and Tenaska Washington II, L.P.—Sargent's motion for summary judgment turns on the effectiveness of the Au-

gust 10, 1992 memorandum, which purportedly announced a change in the May 1990 contract and any subsequent agreements between the parties. Sargent argues that any proposed changes never took effect because he never agreed to them. Tenaska counters, first, that there are disputed issues of fact regarding plaintiff's supposed agreement and, second, that in any event it could change the terms of Sargent's employment at any time, without his consent.

Under Massachusetts law, generally speaking, one party cannot unilaterally change the obligations of another under contract. *New England Mut. Life Ins. Co. v. Harvey*, 82 F.Supp. 702, 706 (D.Mass.1949). Rather, the parties must expressly or impliedly agree to a modification. *A. Leo Nash Steel Corp. v. Southern New England Steel Erection Co., Inc.*, 9 Mass.App.Ct. 377, 383–84, 402 N.E.2d 71 (1980). Such modification requires valid consideration. *Tri–City Concrete Co. v. A.L.A. Const. Co.*, 343 Mass. 425, 427, 179 N.E.2d 319 (1962).

Although Tenaska could, of course, unilaterally fire Sargent and cut off any future entitlements, it could not unilaterally alter the terms of the employment contract governing benefits earned while on the job. Consequently, the court cannot construe the August 10, 1992 memorandum as anything more than a proposed modification to the original employment contract, effective upon mutual assent and consideration.

The question therefore becomes whether Sargent understood the terms of the proposed changes in his compensation and agreed to them. On this point, disputes are legion. Supported by its employees, Tenaska claims that Sargent accepted the new terms in August 1992, or, by the latest, April 1993. In any event, the company argues, he continued to work with knowledge of the new terms, manifesting his tacit agreement. Sargent points out that he never signed the August 10, 1992 memorandum, and argues that he never orally agreed to the new terms and never impliedly assented to any changes in the original contract. Moreover, he claims that the company president told him that the August 10, 1992 memorandum "should never

have been written." In short, genuine issues of material fact fly fast and furious, and summary judgment is therefore inappropriate on this issue.[3]

Sargent argues that, in any event, he is entitled to partial summary judgment based on Tenaska's December 22, 1993 memorandum to him. That memorandum offered Sargent a new position in Omaha *or* termination with "stock in Tenaska Gas Co. and [Tenaska Washington II, L.P.] per your employment letter." On its face, therefore, the memorandum indicates that Sargent would receive 1.5% ownership interests in Tenaska Gas Company and Tenaska Washington II, L.P. if he declined the Omaha position. It is undisputed that Sargent *never* received these interests, in type or amount. Given this, plaintiff argues, he is entitled to summary judgment as to these interests, at a minimum.

It is unclear, however, whether Tenaska intended the December 22, 1993 memorandum to incorporate modifications to the May 1990 contract, or, as Sargent suggests, whether it intended the 1993 memorandum to effect a "waiver" of any attempted modifications and to reinstate the flat terms of the May 1990 contract.[4]

Summary judgment for plaintiff is also complicated by acknowledged uncertainties about the value of certain entitles—Tenaska, Inc. and Lee Mass Cogeneration Co.—in which plaintiff claims an interest. Under Massachusetts law, a party to a contract will be excused from performing a contractual duty when the contract's principal purpose is substantially frustrated by the non-occurrence of a basic assumption of the parties when they entered into the contract. *See Chase Precast Corp. v. John J. Paonessa Co., Inc.,* 409 Mass. 371, 373, 566 N.E.2d 603

(1991). Here, Tenaska argues, both Tenaska and Sargent assumed that Tenaska, Inc. and Lee Mass Cogeneration Company would have sufficient economic value to warrant a distribution of shares; because they do not, the parties' original intent has been substantially frustrated.

Sargent does not entirely disagree, in theory; he is not interested in chasing worthless stock. He claims, however, that these companies—particularly Tenaska, Inc.—*do* have substantial economic value available for distribution. This is a factual dispute for trial.

Sargent's motion for summary judgment is also undermined by disputes about *when* Tenaska should have tendered interests in Tenaska, Inc., Lee Mass Cogeneration Company and Tenaska Gas Company. The May 1990 letter states that those interests would be "made available to you beginning twelve months following employment." In fact, Tenaska tendered Sargent's Tenaska Gas Company interest with a "performance interest date" approximately 15 months after his one-year anniversary, and never tendered any interest in Tenaska, Inc. or Lee Mass Cogeneration Company. Sargent claims that the company agreed to tender the interests *on or about* his first anniversary. Tenaska counters that the contract required it to tender the interests merely *on or any time after* Sargent's one-year anniversary.

Taking the phrase "beginning twelve months following employment" alone, both interpretations have some merit, and both parties have artfully culled deposition testimony to advance their positions. At the same time, neither interpretation can be called definitive at this juncture. Two points deserve special mention. The contract calls for a distribution of Tenaska, Inc., Lee Mass

---

**3.** If Sargent did indeed accept the new terms, his continued performance may have supplied sufficient consideration for the modification. *See Jackson v. Action for Boston Community Development, Inc.,* 403 Mass. 8, 14, 525 N.E.2d 411 (1988). The court may revisit this point at trial, if necessary.

**4.** Admittedly, it is hard to square Tenaska's argument that the December 1993 memorandum is based on a modification with Tenaska's promise of stock "per your employment letter." If Sar-

gent's version of events is correct, and he vehemently opposed any modification of his contract, the renewed promise to tender interests contemplated in the original contract makes sense. At this stage, however, the court must view the facts in the light most favorable to Tenaska. At trial, evidence may be presented to determine whether in fact the December 22, 1993 memorandum is ambiguous on this point. *See Cullinet Software, Inc. v. McCormack Dodge Corp.,* 400 Mass. 775, 777, 511 N.E.2d 1101 (1988).

Cogeneration Company, and Tenaska Gas Company shares "beginning twelve months following employment" *and* "under the terms and conditions of an employee stock ownership plan to be implemented in 1990." The company apparently did not produce such a plan in 1990. Moreover, the contract states that "[t]he level of your ownership interest in the above cited companies will be reviewed eighteen (18) months following your employment start date" for a possible performance-based increase, implying a tender of interests in these companies before this time-specific review.

■ In light of these concerns, as well as those addressed by the parties in their memoranda, the court will withhold judgment on this issue at this time. Given the contract's gaps and ambiguities, parol evidence may be necessary to determine the intention of the parties. *Cullinet Software, Inc. v. McCormack Dodge Corp.*, 400 Mass. 775, 776, 511 N.E.2d 1101 (1988). It may also be necessary to consider how Tenaska expressed and executed similar promises to other employees.

### 2. *Tenaska's Motion*

As the court noted above, Tenaska has directed its motion for summary judgment against what the court has termed the forward-facing claim that it breached its duty of good faith and fair dealing by firing Sargent to deprive him of earned but not yet payable compensation.

Sargent's claim stems from the Supreme Judicial Court's landmark decision in *Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977), which created a cause of action for an at-will employee discharged by an employer in order to deprive him of compensation fairly earned and legitimately expected under contract. *Id.* at 104–05, 364 N.E.2d 1251.

Tenaska contends that *Fortune* offers Sargent no remedy. This is because, even assuming Tenaska fired Sargent with bad motive, any non-vested portion of Sargent's interests—subject to vesting under prescribed, long-term vesting schedules—does not qualify as an "identifiable, future benefit

... reflective of past services" recoverable under *Fortune*. *See Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 673, 429 N.E.2d 21 (1981).

The May 1, 1990 letter sets the backdrop to Tenaska's motion. The letter states that Sargent would receive ownership interests in certain Tenaska-related entities subject to "an employee stock ownership plan." "The details of this plan," it continues, "will include vesting." Moreover, "[t]he employee ownership plan will include a right of company to buy back the ownership interests of terminated employees under specified terms and conditions that will penalize short-term employment and reward performance and long-term accomplishments." Pursuant to the vesting plan, the longer Sargent worked for the company, the less of his stock was subject to repurchase.

The question is whether Sargent may recover for any non-vested portion of his interests under *Fortune*. *Maddaloni v. Western Mass. Bus Lines, Inc.*, 386 Mass. 877, 438 N.E.2d 351 (1982), is instructive on this point. In *Maddaloni*, an at-will employee brought a *Fortune* action claiming that he had been fired in order to deny him earned commissions, which the employer had agreed to pay on the fifteenth of each month. The jury returned a verdict in favor of the plaintiff on the issue of liability. With respect to damages, the jury found that Maddaloni had earned $61,000 in commissions for past services, but awarded him only $28,000 in damages as the amount "attributable" (on a theory of *quantum meruit*) to his work and effort.

The Supreme Judicial Court vacated the trial court's judgment. It found that there was "remedy on the express contract," obviating the need for *quantum meruit* recovery. *Id.* at 883, 438 N.E.2d 351 (citing *Fortune v. National Cash Register Co.*, 373 Mass. 96, 102 & n. 9, 364 N.E.2d 1251 (1977)). "The plaintiff was entitled to $61,000," the court explained, "the amount which the jury determined would be payable in commissions for his services *in accordance with the contract.*" *Id.* (emphasis supplied).

*Maddaloni* makes clear that a plaintiff's remedy under *Fortune* is limited to financial

benefits due and owing under contract. Given this limitation, the issue comes into narrow focus: What was Sargent owed *under his contract?* The May 1990 contract explicitly stated that his interests would be subject to long-term vesting schedules. Assuming a breach, these schedules offered easy reference to what Sargent fairly earned and legitimately expected at the time of his discharge.

*Cataldo v. Zuckerman,* 20 Mass.App.Ct. 731, 482 N.E.2d 849 (1985), does not compel a different conclusion. In *Cataldo,* employer and employee entered into an at-will contract. The employer agreed to compensate the employee with shares of "developer's equity" in several existing and future real estate projects. The employee later sued, claiming that he had been discharged for the purpose of depriving him of shares of the developer's equity in then viable projects.

The Appeals Court found that "[a]ctual realization by Cataldo of the value of any share of the developer's equity was for the future ... but ownership of the possibility was intended to be and was part of Cataldo's day-to-day compensation for work currently being done," and held that at the time of Cataldo's discharge, "the possibility that Cataldo would gain later a vested share of the developer's equity [in each project] then viable was sufficiently an 'identifiable, future benefit ... reflective of past services' " qualifying for protection under *Fortune. Id.* at 740–41, 482 N.E.2d 849 (citation omitted). The court concluded that the appropriate remedy was "the value of these interests at the time of his discharge." *Id.*

*Cataldo* clearly indicates, and Tenaska does not dispute, that interests subject to a possibility of vesting may qualify under *Fortune.* In *Cataldo,* however, the possibility of capturing a share of the developer's equity provided *day-to-day* compensation, and vested in one lump sum upon a project's completion. Based on the structure of the parties' agreement, therefore, the court was forced to use a *quantum meruit* recovery theory to determine the value of those shares at the time of the plaintiff's discharge.

■ Under Sargent's contract, on the other hand, the possibility of vesting hinged on his "performance and long-term accomplishments." Sargent cannot escape the plain effect of the contract's language. Tenaska intended, and Sargent agreed, that any fractional accumulations of vested interests would "reward performance and long-term accomplishments." As such, Sargent's claim to the non-vested portions of his interests cannot fairly be characterized as "identifiable, reasonably anticipated future compensation, based on his *past* services." *See Gram,* 384 Mass. at 660, 429 N.E.2d 21 (emphasis supplied). At all times, the schedules plainly set out what Tenaska owed Sargent under the contract, no more and no less. His "day-to-day" compensation was set; the future interests he now seeks damages for were clearly intended to compensate future performance. *Fortune* and its progeny do not contemplate this sort of claim.

Accordingly, the court will allow defendant's motion for summary judgment on Counts I and II with respect to plaintiff's claims related to any interests not vested at the time of his termination. Claims asserted in Counts I and II for damages or specific performance related to vested interests will move forward to trial.

### C.  *Count III:  Common Law Fraud*

■ To succeed on his fraud claim, Sargent must show that the defendant knowingly made false statements of material fact to induce him into an employment relationship, and that Sargent relied on those false statements to his detriment. *See Adams v. Hyannis Harborview, Inc.,* 838 F.Supp. 676, 694 (D.Mass.1993).

■ In general, promissory statements do not give rise to an action for fraud. *Barrett Associates, Inc. v. Aronson,* 346 Mass. 150, 152, 190 N.E.2d 867 (1963). Here, however, Sargent claims that Tenaska misrepresented its actual intentions *at the time,* and that he relied on those misrepresentations to his detriment. This theory, if supported by cognizable evidence, may frame a cause of action sounding in tort under Massachusetts law. *McEvoy Travel Bureau, Inc. v. Norton Co.,* 408 Mass. 704, 709–10, 563 N.E.2d 188 (1990).

Viewing the facts in the light most favorable to Sargent, however, there is insufficient evidence to raise a genuine issue on this claim. No cognizable evidence suggests that Tenaska formed a specific intent to defraud Sargent *at the time the parties entered into their employment contract* or at any other pertinent subsequent point in time. To be sure, in May 1990 Tenaska did promise to make certain ownership interests available to Sargent; to date, it has not done so. There is no evidence to suggest, however, that the company made promises it never expected to keep. What evidence exists suggests the contrary: that Tenaska later discovered business reasons for changing course. But, regardless of defendant's business-related explanations, plaintiff is required to present something beyond speculation to support his claim of a contemporaneous intent to defraud in response to defendant's motion for summary judgment.

Sargent's claim of fraud in connection with the August 10, 1992 memorandum, proposing a reduction in certain ownership interests, is also fatally unsupported. According to Sargent's deposition testimony, he was told by Hawks, at most, that the memorandum "shouldn't have been written" and was "ineffective." Sargent contends that this remark might be construed by a factfinder as evidence of an effort to deceive him into believing that the company would not seek any future changes in his compensation. But, even accepting Sargent's version as true, Hawks' remark neither explained his reasons for repealing the memorandum nor explicitly affirmed the *status quo*. According to Sargent, Hawks merely left him with an "impression" that nothing would change. Given plaintiff's burden on summary judgment, Sargent's "impression" leaves no room for a triable issue on fraud.

Finally, Sargent claims that Tenaska never intended to keep its promises made in the December 22, 1993 memorandum, which offered Sargent a choice between a position in Omaha or termination with "stock in Tenaska Gas Co. and [Tenaska Washington II, L.P.] per your employment letter." Again, no evidence supports the conclusion that defendant had a contemporaneous intent to deceive.

Defendant's failure to tender the stock may readily be explained by its reasonable conclusion that plaintiff had rejected its offer *in toto*, an interpretation bolstered by plaintiff's filing of this lawsuit only three days after he left the company. To repeat, for purposes of Sargent's fraud claim, no evidence supports the conclusion that Tenaska made any intentional misrepresentation in December 1993.

For these reasons, the court will allow defendant's motion for summary judgment on plaintiff's fraud claim.

### D. *Count IV: Violation of Chapter 93A*

Chapter 93A provides a cause of action for unfair or deceptive acts by one businessman against another. *See* Mass. Gen.L. ch. 93A, § 11. "It is unequivocally established that disputes between employers and employees fall outside the scope of section 11." *Bolen v. Paragon Plastics, Inc.*, 754 F.Supp. 221, 227 (D.Mass.1990) (citing *Manning v. Zuckerman*, 388 Mass. 8, 14, 444 N.E.2d 1262 (1983)). For purposes of summary judgment, therefore, the question is whether Sargent's ch. 93A claim arises out of a dispute between "discrete, independent business entities," *id.* at 227, or between an employer and an employee.

It is simply obvious that Sargent's claim emerges from the parties' employment relationship. The allegedly unfair conduct here—Tenaska's failure to tender certain interests in Tenaska-related entities—springs from the May 1990 employment contract and any subsequent modifications.

Sargent argues that the unfair or deceptive conduct occurred *before* and *after*—but not *during*—his employment with the company, thus removing the conduct from the employment context. The argument is imaginative, but unpersuasive. The appropriate inquiry for a Section 11 claim is not when the alleged misconduct took place, but whether "[t]aken as a whole, the allegations ... may not be characterized fairly as 'arising out of an employment contract.'" *Mitchelson v. Aviation Simulation Technology, Inc.*, 582 F.Supp. 1, 2 (D.Mass.1983).

Here, Sargent's claim stems from the company's failure to tender certain interests,

which, plaintiff claims, it agreed to make available to him under the terms of their employment contract and its subsequent modifications. It could not be clearer that plaintiff's claims arise from his employment relationship.

In sum, the court will enter judgment in favor of defendant on plaintiff's ch. 93A claim.

## V. CONCLUSION

For the foregoing reasons, the court will DENY plaintiff's Motion for Summary Judgment and Motion to Strike, and will ALLOW defendant's Motion for Partial Summary Judgment. This case will go forward only on the portions of Counts I and II related to interests vested on the date of plaintiff's termination.

A separate order will issue.