A. LEO NASH STEEL CORPORATION *vs.* SOUTHERN NEW
ENGLAND STEEL ERECTION COMPANY, INC., & another.

Berkshire. January 23, 1980. — March 18, 1980.

Present: HALE, C.J., GRANT, & NOLAN, JJ.

*Contract,* Building, Modification, Damages. *Practice, Civil,* Master:
report of evidence, findings, objections.

In a case referred to a master by an order of reference which provided that
the master "may" file a transcript of the evidence with his report, the
judge did not abuse his discretion in refusing to consider the transcript
and in refusing to recommit the report for summaries of the evidence.
[382-383]

In an action for damages for breach of contract which was heard by a
master, the judge erred in rejecting the master's finding that the
original contract had been modified by a subsequent agreement where
the subsidiary findings of fact amply supported the master's conclusion. [383-384]

CIVIL ACTION commenced in the Superior Court on June 30, 1976.

The case was heard by *Cross,* J., on a master's report.

*Daniel H. Kelleher* for Commercial Union Insurance Company (*Richard M. Canzano,* for Southern New England Steel Erection Company, Inc., with him).

*David O. Burbank* for the plaintiff.

NOLAN, J.  This is an action by A. Leo Nash Steel Corporation (Nash) against Southern New England Steel Erection Co., Inc. (Southern), for damages for breach of contract, and against Commercial Union Insurance Company (Commercial Union) on a performance bond in the amount of $43,150 which named Commercial Union as surety, Southern as principal, and Nash as obligee.  The case was referred to a master by an order of reference pursuant to Mass.R.Civ.P. 53, as amended, 367 Mass. 917 (1975), and Rule 49 of the Superior Court, as amended (1976). The order provided that the master "may" file a transcript of the evidence and the proceedings with his report.  The master found for Nash against Southern in the amount of $26,372.76 and against Nash on Southern's counterclaim in the amount of $7,228.57; damages were therefore assessed for Nash against Southern and Commercial Union in the amount of $19,144.19.  The master filed a copy of the transcript with his report.

Nash, Southern and Commercial Union filed various objections to the master's report, as well as requests for summaries of the evidence.  In reply, the master filed summaries of the evidence relevant to the plaintiff's particularized objections but denied the summaries requested by Commercial Union.  Those requests encompassed much of the two thousand pages of transcript accumulated during hearings lasting fifteen (nonconsecutive) days.

All pending objections were heard by a judge on October 20, 1978.  The transcript of hearings before the master was offered by Commercial Union and admitted de bene. Subsequently, Commercial Union filed a request for a ruling that all the evidence, including the transcript of testimony,

had been reported. On December 13, 1978, the judge denied that request, denied Commercial Union's various motions to modify or recommit the report, denied its requests for summaries of the evidence and reversed himself on the question whether he would consider the transcript. The judge allowed in part Nash's amended motion to modify, and adopted the report as so modified. On the same day judgment was entered for Nash against both defendants in the amount of $34,230.93. Commercial Union appeals.

Two principal issues are raised here: (1) whether the judge erred in determining that he need not, and would not, consider the transcript of the evidence before the master prior to ruling on Commercial Union's objections to the report; and (2) whether the judge erred in modifying the master's report in accordance with Nash's requests, thereby increasing the amount of the damages assessed against Southern and Commercial Union from $19,144.19 to $34,230.93.

We draw our facts from the master's subsidiary findings, which are binding upon us unless they are clearly erroneous, mutually inconsistent, or vitiated in view of controlling law. Mass.R.Civ.P. 53(e)(2), 365 Mass. 820 (1974). *O'Day* v. *Theran*, 7 Mass. App. Ct. 622, 623 (1979).

Prior to 1974 the city of Everett determined to erect an addition to one of its school buildings. The general contractor for the job was Bond Brothers (Bond). On April 9, 1974, Bond awarded Nash a subcontract to supply and erect the structural steel for the project. On May 14, 1974, Southern, having examined the plans and specifications at Bond's office, contracted with Nash to perform the steel erection required.

The Nash-Southern contract contained a formula for determining the price to be paid to Southern which was based on various unit prices rather than on a fixed price.[1] South-

---

[1] The master found that the contract provided for payment by Nash on a unit basis as follows: $75 per ton of structural steel erected, 6 cents per square foot of deck, and 65 cents per hundred studs. Application of this formula to the facts yields a price of approximately $39,890, because the project required 370 tons of structural steel, roughly 69,000 square feet of deck, and $8,000 worth of studs.

ern provided Nash with performance and payment bonds issued by Commercial Union for $43,150 in accordance with the subcontract terms.

On April 18, 1975, the erection began with an eight-week anticipated completion time. The work progressed very slowly, falling behind the proposed schedule, and Southern made several promises to complete the work, each of which was broken. Approximately June 12, 1975, the project co-ordinator for Bond, one Shaughnessey, notified Nash by letter that Southern was not following the erection schedule, that Southern was holding up progress on the project, and that Nash would be held responsible for any loss to Bond. Between that time and late July, 1975, representatives of Nash and Southern communicated frequently, Nash requesting Southern to hire more workers and proceed on schedule and Southern representing that it would comply. When Southern failed to perform as promised, representatives of Nash, Southern and Bond met at the construction site on July 24, 1975. Southern told Nash that it needed more money to continue the job; Nash refused to pay any more until the steel erection work should be completed; Bond wanted Southern removed from the project. Nash said that it was reluctant to remove Southern because its people knew the job. At this time, a revised construction schedule was hammered out, reduced to writing, and initialled at the job site. In accordance with the terms of the document, $22,000 was placed in escrow and was indexed to the revised construction schedule.[2]

---

[2] The significance of this agreement is contested and has been treated as follows: Commercial Union argues that this agreement constituted a modification of the contract. Nash argues that this agreement did not modify the contract or, put another away, did not replace or supplement the originally agreed upon contract formula. The master interpreted the revised production agreement as a modification of the initial contract which entitled Southern to money included in the escrow account according to work performed, although this total might exceed the $39,890 total computed as in note 1, *supra*. The judge rejected the master's treatment of this matter, ruling that this agreement did not alter the contract formula originally accepted by both parties.

Subsequent to July 24, 1975, Southern performed further erection work on the project and submitted invoices to Nash totalling $17,562.74. Nash approved invoices totalling $11,120.17, and escrow agents paid this amount to Southern. According to the master, the remaining $10,879.83 belongs to Nash.

On August 28, 1975, nineteen weeks after the job was commenced, Southern left the project in an incomplete state and refused to return. Nash demanded that Commercial Union complete the job. Commercial Union, which had been kept advised by Nash of its problems with Southern, refused.[3] On the same day Nash employed another steel erection firm (Winford) to complete the work. The job was completed October 22, 1975.[4]

We conclude that the judge did not err in refusing to consider the transcript of the evidence before the master. However, he did err in rejecting the master's subsidiary findings regarding the underlying contractual relationship between Nash and Southern and in modifying the master's computation of Nash's damages.

---

[3] On July 17, 1975, Nash advised Commercial Union that Southern was not complying with the terms of the contract. On July 31, 1975, Nash demanded that Commercial Union assume responsibility for Southern's nonperformance. On August 1, 1975, Nash requested Commercial Union to furnish Nash with a written assurance that it would continue making required payments on behalf of Southern if the $22,000 in escrow should prove insufficient. On August 28, 1975, Nash's attorney notified Commercial Union that Southern had pulled its men off the job and demanded that Commercial Union immediately undertake the performance of Southern's obligations in accordance with the bond. Commercial Union declined and denied any responsibility for Southern's actions. On September 16, 1975, Nash's attorney repeated the demands on behalf of his client.

[4] Nash paid Winford a total of $40,982.20 for its work on the project. The master found that Nash suffered damages attributable to Southern's failure to complete the project in an amount equal to one half the total which Nash paid to Winford, or $20,491.10. In addition to this figure, the master awarded Nash $5,881.66, which Bond assessed against Nash for errors, omissions and damage caused by Southern. The master subtracted from this sum of $26,372.76, $7,228.57, which he found Nash owed Southern on the latter's counterclaim, thereby awarding Nash a net of $19,144.19.

1. *The judge did not err in refusing to consider the transcript of the evidence before the master.*

The order of reference did not require the master to file a transcript of the hearings with his report.[5] Consequently, it was within the judge's discretion whether to review the transcript in ruling on Commercial Union's objections. See Mass.R.Civ.P. 53(e)(1). *Shelburne Shirt Co.* v. *Singer,* 322 Mass. 262, 265 (1948). *Peters* v. *Wallach,* 366 Mass. 622, 626 (1975). *Michelson* v. *Aronson,* 4 Mass. App. Ct. 182, 184-186 (1976). To accommodate the defendants in their oral arguments, the judge admitted the transcript de bene. But upon further consideration, he declined to review the voluminous transcript and vacated his previous ruling. No abuse of discretion has been demonstrated. See *Minot* v. *Minot,* 319 Mass. 253, 258 (1946).

Commercial Union filed objections to virtually all the findings in the master's carefully drafted report that were unfavorable to it, primarily on the ground that "the evidence in law is not sufficient to support the findings" (see *O'Brien* v. *Dwight,* 363 Mass. 256, 281 [1973]), and requested that the master report summaries of the evidence. The master declined to do so,[6] and we are unable to say that

[5] The reference neither required nor prohibited the filing of the transcript. The judge, without regard to the language of the reference, could have, sua sponte, obtained the evidence before the master, *Minot* v. *Minot,* 319 Mass. 253, 258 (1946), but determined in the exercise of his discretion that he would not do so.

[6] The master assigned the following reasons for his action: The objections did not invite attention to any page of the transcript, or to the testimony of any witness, to support a particular objection; the objections were not supported by affidavits to verify evidence sustaining the particular objection; the objections contained merely general and repetitious statements that the evidence was insufficient to support a finding, without making a definite reference to the particular question of law involved; and rule 49 is not intended to impose upon a master the herculean task of sorting the entire testimony in order to prepare a general summary of the evidence in response to such vague and all-encompassing objections. A master should refrain from commenting on objections filed by a party requesting summaries of the evidence. See *Crowley* v. *J.C. Ryan Construction, Inc.,* 356 Mass. 31, 34 (1969). The paper entitled "Master's

the court abused its discretion in refusing to recommit for summaries. "A party cannot convert a question of fact into one of law by merely asserting that certain conclusions are required by the law, and thus cause practically all the evidence in the case to be summarized and reported." *Minot* v. *Minot,* 319 Mass. at 260. *H. Piken & Co.* v. *Planet Construction Corp.,* 3 Mass. App. Ct. 246, 248 (1975), and cases cited.

2. *The judge erred in modifying the master's award of damages to Nash.*

The judge erred in rejecting the master's subsidiary findings that the original Nash-Southern contract had been modified by the agreement adopted by the parties at the construction site on July 24, 1975.

In reviewing cases such as this, we must take the master's subsidiary findings, together with the inferences that ought to be drawn from them, and reach our own general and ultimate conclusion. *John F. Miller Co.* v. *George Fichera Constr. Corp.,* 7 Mass. App. Ct. 494, 496 (1979).

The master found subsidiary facts which required the conclusion that Nash elected and agreed with Southern to enlarge the cost and production terms of the original contract, thereby modifying it. This was properly a factual determination for the master. See *Taxi Service Co.* v. *Gulf Refining Co.,* 252 Mass. 314, 319-320 (1925); *L. W. Severance & Sons* v. *Angley,* 332 Mass. 432, 438 (1955). There was consideration for the modification. *Parrot* v. *Mexican Central Railway,* 207 Mass. 184, 194-195 (1911). *Swartz* v. *Lieberman,* 323 Mass. 109, 112-113 (1948). The judge, however, ruled that "[t]here is no indication *in this modification agreement* that the contract formula originally accepted by both parties was *intended* to be altered" (emphasis supplied). This is a misstatement of the law. An agreement to modify a contract need not be express. Rather, it may be inferred from the attendant circumstances and conduct of the parties. 15

response to the defendants' objections to master's report and request for report of evidence" should have been struck by the judge. The irregularity, however, was not reversible error. *Ibid.*

Williston, Contracts § 1826, at 482-483 (3d ed. 1972). *Rogers* v. *Rogers & Brother,* 139 Mass. 440, 443-444 (1885). *Gouzoulas* v. *Stock & Sons,* 223 Mass. 537, 539 (1916). *Martiniello* v. *Bamel,* 255 Mass. 25, 28 (1926).

Our review of the subsidiary findings compels us to agree with the master. The conduct, if not the words, of the parties supports a conclusion that the original contract was modified and superseded by the terms of the July 24 agreement. See *Rogers* v. *Rogers & Brother, supra.*

The judge therefore misapplied the law to his review of the master's report. Upon the assumption of correcting an erroneous legal conclusion, he supplanted a factual determination which draws ample support from the subsidiary findings. The judge's modification of the master's report and award is therefore in error.

In computing damages, the master found that upon Southern's breach of the modified contract, Southern owed Nash $20,491.10[7] as reimbursement for money expended by Nash to have Winford complete the project. The master further found for Nash in the amount of $5,881.66, which Bond had backcharged to Nash. Consistent with the view that the original Nash-Southern contract was modified, the master, on the other hand, allowed Southern to retain all money paid it by Nash, totalling $49,432.17, apparently on the theory of quantum meruit.[8] Apart from the money retained, the master awarded Southern $7,228.57 on Southern's counterclaim for various erection work performed on the project for which it was not paid by Nash.

In awarding damages, the master subtracted $7,228.57, Southern's counterclaim, from $26,372.76, Nash's damages against Southern, for an award of $19,144.19 for Nash. For the reasons given above, the judge's modification of this

---

[7] See note 4, *supra.*

[8] No question has been raised as to whether recovery in quantum meruit was appropriate in the circumstances.

award was in error, and the master's award must be reinstated.[9]

Commercial Union further argues that the entire sum of $22,000 in escrow funds was committed to the contract over and above the $39,890 figure established by the court. It urges that its liability must be reduced pursuant to the terms of the subcontract performance bond by that amount. The argument is misplaced. The terms of the performance bond, in essence, required Nash to minimize its claim against Commercial Union by subtracting any money owed it by Southern at the time Southern violated the contract from the total amount paid to complete the project. According to the master's report, Southern retained all that it was paid, including $11,120.17 of the escrow funds. However, Southern was not entitled to the remaining $10,879.83 of the escrow funds because it walked off the project. As a corollary, Commercial Union is not entitled to credit against its damages to Nash, for Southern's breach of contract, money which Southern never earned.

Finally, Commercial Union asserts that due to "overpayments" by Nash to Southern its risk was materially increased and thus it should be discharged from all liability or, alternatively, discharged pro tanto to the extent of the "overpayments." This assertion falls short of anything that can properly be called an argument within the meaning of Mass. R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). Commercial Union has not assisted the court with appropriate

---

[9] Because the judge rejected the master's subsidiary findings concerning the modification of the agreement, he took an entirely different tack in computing Nash's damages. The judge ruled that Southern was entitled to $39,890, the amount yielded by application of the original contract formula, plus $1,684 in "extras" less $5,881.66 in backcharges, for a total of $35,692.34. The judge thereupon subtracted this amount from the $49,432.17 that Nash paid Southern, yielding $13,739.83. To this figure the judge added the $20,491.10 Nash paid to Winford. In sum, the judge ruled that Southern owed Nash $49,472.17 − $35,692.34 + $20,491.10 = $34,230.93. Furthermore, consistent with his ruling that the contract formula was not modified, the judge disallowed the $7,228,57 awarded Southern on its counterclaim for work done prior to its leaving the job.

citation of authority. Therefore, no discussion of this point is required. *Lolos* v. *Berlin,* 338 Mass. 10, 14 (1958).

The judgment against Commercial Union and Southern is to be modified to restate their liability to Nash at $19,144.19 and, as so modified, is affirmed.

*So ordered.*