ESO, INC. *vs.* ANNE KASPARIAN, trustee.[1]

No. 90-P-926.

Norfolk. December 12, 1991. - June 26, 1992.

Present: BROWN, JACOBS, & LAURENCE, JJ.

*Contract*, Construction contract, Architectural services, What constitutes, Performance and breach, Damages. *Practice, Civil*, Master: findings.

In an action heard by a master arising from the plaintiff's orally agreeing to provide architectural services to the defendant for the reconstruction of certain property in return for a stated fee, the master's findings that the plaintiff was responsible for defective work performed by the general contractor, that the plaintiff was liable on the defendant's counterclaim to pay damages due to the construction of deficiencies, and that the defendant had paid its full obligation to the plaintiff, were not clearly erroneous. [733-735]

CIVIL ACTION commenced in the Superior Court Department on May 13, 1983.

The case was heard by *James P. Lynch, Jr.*, J., on a master's report.

*Warren D. Hutchison* for the plaintiff.

*Donna E. Cohen* for the defendant.

BROWN, J. This contractual dispute was tried before a master whose modified report was adopted by a judge of the Superior Court who entered a judgment favorable to the defendant on the basis thereof. We affirm.

As found by the master, the facts are as follows. Harry Eagan and Paul Cronin, the principals of ESO, Inc. (ESO), and Triad Nominee Trust (Triad), respectively, developed a friendly relationship after meeting at a social gathering in 1980. In August, 1981, ESO orally agreed to provide architectural services to Triad for the reconstruction of a certain

---

[1] Of the Triad Nominee Trust.

property — the so-called Sears Building — located in Lawrence. The parties never reduced their agreement to a writing. There is, however, no dispute that Triad agreed to pay ESO a fee of ten percent of the total construction cost. The original estimated cost of the reconstruction work was between $900,000 and $937,000. Due in part to financing difficulties, the scope of the project was reduced and the final construction cost was $450,000.

The work on the Sears Building was to be done on what is known in the construction trade as a "design build" fast track, which means that the owner, the architect, and the general contractor design the building and perform the construction at the same time.[2] Upon the recommendation of ESO, Triad hired New England Construction and Management Co., Inc. (NECM), as the general contractor for the project. NECM was to build according to plans prepared by or under the direction of ESO; however, NECM began construction on the project before the plans had been completed. No final architectural drawings were ever submitted by ESO, and the construction work was done by NECM using progress plans developed by ESO.

NECM and Triad entered into a separate agreement which was reduced to a writing after construction on the project had begun. There were significant delays in the construction as well as substantial defects and errors in the work.[3]

Triad paid ESO a total of $45,000 for its architectural services based upon the renegotiated construction contract price between NECM and Triad. ESO filed suit against Triad, claiming that, despite the reduction in the scope of the work done by NECM and the final cost of the project, it was entitled to be paid $90,000, an amount based upon ten percent of

---

[2]For a discussion of increased liability brought on by the emergence of "design build" projects, see Block, As The Walls Came Tumbling Down: Architects' Expanded Liability Under Design-Build/Construction Contracting, 17 J. Marshall L. Rev. 1, 7-10 (1984).

[3]Some of the most egregious defects were the erection of a beam that intersected with a wall in the middle of a window, the improper installation of steel columns and sewer connections, and the failure to level existing wood floors.

the original estimate of the reconstruction work. Triad filed a counterclaim against ESO for damages resulting from delays and corrective work necessitated by ESO's faulty performance. The master found against ESO on its complaint[4] and in favor of Triad on its counterclaim and ordered ESO to pay $61,950.78 in damages to Triad due to construction deficiencies.

The master filed his initial report in which he found that, in the absence of a written agreement between ESO and Triad, "the general understanding of architectural services must rule and thus comprises a total responsibility on the part of ESO to supervise the construction and to halt and correct construction where faulty or less than the average standards of acceptable construction practices." A Superior Court judge recommitted the case to the master to clarify certain findings, including the one quoted above. The master filed a supplementary report which further clarified that finding by setting out the evidence upon which the master relied in concluding that ESO was responsible for supervising the construction. Although we do not adopt the master's characterization of the supervisory duty assumed by ESO as the "general understanding of architectural services," we do not find the master's findings, which provide the basis for the imposition of liability in this case, to be clearly erroneous.

"A master's subsidiary findings of fact . . . are binding upon us unless they are clearly erroneous, mutually inconsistent, contradictory or vitiated in view of the controlling law." *John F. Miller Co.* v. *George Fichera Constr. Corp.*, 7 Mass. App. Ct. 494, 495 (1979). We are, however, obligated to draw inferences that ought to be drawn from the master's subsidiary findings and to reach our own general and ultimate conclusions. *Id.* at 496.

The master's finding that ESO was responsible for the defective construction work is not clearly erroneous. It is well settled that an agreement need not be in writing in order to

---

[4]The evidence in the record reveals that ESO based its fee on the renegotiated contract amount, $450,000. The finding of the master that Triad paid its full obligation to ESO is warranted by the evidence.

be enforceable. See Restatement (Second) of Contracts § 19 (1981). See also *Novel Iron Works, Inc.* v. *Wexler Constr. Co.*, 26 Mass. App. Ct. 401, 408 (1988). In the absence of a written agreement, it was for the master to decide, based upon the testimony before him, what were the terms of the parties' agreement. While it may be generally preferable for questions of contract interpretation to be decided by a judge rather than a master, *Glynn* v. *Gloucester*, 9 Mass. App. Ct. 454, 462-463 (1980), in a case where, as here, no written contract exists and interpretation depends upon the weighing of testimony, the master is in as good a position as a trial judge would be to make a factual determination of the terms of the agreement of the parties. See *A. Leo Nash Steel Corp.* v. *Southern New England Steel Erection Co.*, 9 Mass. App. Ct. 377, 383-384 (1980).

A review of the record reveals that ESO admitted in its answer to Triad's counterclaim that it was responsible for supervision; that Harry Eagan testified that ESO was supervising the construction work and actually billed Triad for supervision services; that ESO was to requisition payments (i.e., so-called "progress payments") from the bank after representing that certain work had been done; and that ESO did in fact exercise control over NECM in various ways. This evidence is sufficient to support the finding that ESO was responsible for supervising, and in fact did supervise, the work of NECM.[5] We think it is a reasonable inference from the seriousness of the construction defects in this case that ESO, in the exercise of its supervisory function, should have detected these problems promptly.[6]

---

[5]ESO's argument that the written agreement between Triad and NECM relieves it of any responsibility for supervision lacks persuasive force. ESO was never a party to that agreement, and ESO's actual supervision of the project, as well as its billing Triad for supervision services, bespeak a different understanding of its responsibility.

[6]Relying on a series of out-of-State cases, ESO argues that an architect is not responsible for supervision without an express agreement. See, e.g., *Ramey Constr. Co.* v. *Apache Tribe of Mescalero Reservation*, 673 F.2d 315 (10th Cir. 1982); *Diomar* v. *Landmark Assocs.*, 81 Ill. App. 3d 1135 (1980); and *Welch* v. *Grant Dev. Co.*, 120 Misc. 2d 493 (N.Y. Sup. Ct. 1983). These cases are inapposite. All concern interpretation of written

There was no error in the master's award of damages to Triad. Based upon the costs of corrective work as set out in Exhibit A to the master's report, the master was warranted in granting the assessed damages to Triad.

*Judgment affirmed.*

---

agreements in circumstances quite unlike those present here. In this case, the scope of the actual agreement between ESO and Triad was a question to be decided by the fact finder.