Doerfer, J.
The plaintiff, ChiCorp Financial Services, Inc. (“ChiCorp"), brought this action, as as-signee of a lessor’s interest in a lease of certain telephone equipment, against the lessee, the University of Massachusetts (“UMass”), to recover damages arising out or an alleged breach of that lease. This matter is before the court on both parties’ motions for summary judgment on the issue of defendant UMass’s liability for failure to render performance of certain obligations under the lease to plaintiff ChiCorp.
BACKGROUND[1]
On August 25, 1988, UMass and CIS Corporation (“CIS”) entered into an equipment lease (“the lease”), whereby CIS leased to UMass certain telephone equipment manufactured by the American Telephone and Telegraph Company (“AT&T’) for a term of twenty-four months, running from September 1, 1988 through August 31, 1990. The monthly rent of $58,000 was to be paid “in a timely manner” to the lessor “or its assigns.”[3] Any payment under the lease past due more than thirty days was to be immediately payable with interest computed at a rate of 1.5% per month from the due date. Title to the equipment remained in the name of the lessor, although UMass had the option of purchasing the equipment for its fair market value. UMass reserved the right to terminate the lease at the end of any month between August 1989 and July 1990 with not less than ninety days' written notice to the lessor. If UMass exercised its option to terminate the lease early, it was to return the equipment to the lessor and pay an early termination fee.[4]
On October 26, 1988, Christine Mruk (“Mruk”) of CIS sent Donald Grady (“Grady”) of UMass three copies of a Notice of Assignment, which, according to the accompanying cover letter, “acknowledge(d) the assignment of the rental payments to The Chicago Corporation, the As-signee.’’[5] In the cover letter, Mruk asked Grady to “forward for signature and return all three copies” and to contact her if he had any questions. Grady telephoned Mruk to ask about the “intent” of the documents and the identity of “Tie Chicago Corporation.” According to Grady’s recollection,[6] Mruk told him to take no action with regard to the documents, and Grady wrote the word “waived” on the first copy of the notice, which he neither signed nor returned. He also wrote “ChiCorp Financial Services” next to “The Chicago Corporation” — "evidently" because Mruk identified The Chicago Corporation as ChiCorp. Grady did not recall any conversation about an assignment in general or about ChiCorp’s role as as-signee in particular.
On November 10, 1988, pursuant to an Assignment and Guaranty Agreement, CIS assigned all its right, title and interest in the lease to the plaintiff, ChiCorp. ChiCorp paid AT&T in excess of $1.1 million as consideration for the assignment from CIS.
By a check dated November 18, 1988, UMass made a $174,000 payment under the lease to CIS; by a check dated December 12, 1988, UMass made a lease payment of $58,000 to CIS.
In a memorandum dated December 27, 1988, Grady, making specific reference to the lease provision for “assignment of lease payments,” instructed the UMass Accounts Payable Department to henceforth issue monthly lease payment checks to ChiCorp rather than to CIS. Accordingly, from December 1988 through June 1989, UMass made monthly payments of $58,000 directly to ChiCorp.[7]
On July 28, 1989, UMass received a notice from CIS addressed to all CIS customers to send any notifications of lease termination to a new address and to “please adhere” to the “notice period as set forth” in their master lease.
In a letter dated August 23, 1989, Grady informed CIS[8] that UMass intended to exercise its option to *534 terminate the lease as of October 31, 1989 and requested an invoice for $213,000, Le., the termination fee designated for that date.[9]
On September 15, 1989, Grady received a letter from ChiCorp Senior Vice President Jeffrey Malecek (“Malecek”), dated September 12. The letter[10] announced that ChiCorp would begin billing and collecting payments due under the CIS equipment lease directly, starting with the August 1989 payment, “as per the Assignment and Guaranty Agreement” between CIS and ChiCorp, a copy of which Malecek enclosed. That assignment, which was “made as of November 10, 1988 by CIS CORPORATION, INC. [as Assignor] . . . and CHICORP FINANCIAL SERVICES, INC. [as Assignee],” provided that “the Assignor hereby sells, assigns and delivers to Assignee all right, title and interest of Assignor in and to that certain Equipment Lease/Purchase Agreement between the Assignor, as lessor, and the Lessee as lessee for the acquisition of equipment described in the Agreement and the Schedule attached thereto, and all rights of the Assignor to receive any and all payments of principal and interest payable pursuant to the Agreement from and after the date hereof and any and all amounts relating to options to purchase.” ChiCorp’s Malecek also enclosed invoices for the August and September 1989 lease installments.
On October 19, 1989, Grady was instructed to take “appropriate action” with regard to another letter from ChiCorp’s Malecek, dated October 12, which advised UMass that any and all termination payments due under the lease were to be paid to ChiCorp “and not to CIS.” On October 26, 1989, Grady received a third letter from ChiCorp’s Malecek, dated October 19, instructing UMass not to return the leased equipment to CIS “unless a written authorization from ChiCorp as Assignee of the contract has been received.”
On October 31, 1989, ChiCorp’s Malecek sent a letter to CIS, copied to Grady at UMass, to serve as “invoice and notice” per the provisions of the Assignment and Guaranty Agreement between CIS and Chi-Corp, detailing the sums due ChiCorp under the lease. Specifically, Malecek noted that “[t]he payment due 9/30/89 and 10/30/89 each in the amount of $58,000, as well as the then appropriate termination fee of $213,000. can be deducted from the . . . payoff amount.” Malecek also informed CIS that UMass had been put on notice not to ship the equipment to a CIS-designated destination until CIS paid ChiCorp the sums due, at which time ChiCorp would “disclaim and release any future interest in the equipment."
On November 17, 1989, the leased telephone equipment was removed from UMass’s premises; on November 30, 1989, the equipment was delivered to CIS’s designee, System Assurance.[11]
On January 22, 1990, UMass made a lease payment of $58,000 to CIS; on February 2, UMass paid CIS a $213,000 termination fee. On February 23, CIS remitted a check for $271,000[12] to ChiCorp.
CIS has refused to honor the guaranty to ChiCorp under the Assignment and Guaranty Agreement.[13] ChiCorp filed suit against UMass on August 26, 1992.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue “and [further,] that the moving party is entitled to judgment as a matter of law.” Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). Where both parties have moved for summary judgment and “in essence there is no real dispute as to the salient facts or if only a question of law is involved,” summary judgment shall be granted to the party entitled to judgment as a matter of law.” Cassesso, supra, 390 Mass. at 422.
Four specific lease obligations are at issue in this case. ChiCorp asserts UMass is liable to it for: 1) one monthly rental payment of $58,000, which ChiCorp claims it never received and which UMass claims it paid (“misdirected") to CIS; 2) one rental payment of $58,000 for the month of November 1989, for which ChiCorp asserts UMass is liable for having provided less than ninety days’ notice of its intent to terminate the lease;[14] 3) the interest due for late payments under the lease; and 4) the fair market value of the leased telephone equipment, which UMass returned to CIS’s designee, rather than to ChiCorp. UMass denies all liability.
1. The “Missing” $58,000 Installment
By a check dated November 18, 1988, UMass made a payment to CIS of $174,000, which, it claims, was applicable to the September, October, and November 1988 lease installments. UMass asserts that this November 1988 installment must be the payment at issue here, since CIS did not assign the lease to ChiCorp until November 10, 1988, and argues that it cannot be faulted for “misdirecting”[15] the disputed monthly payment to CIS, since it made the payment to CIS, the original lessor, before receiving proper notice of the assignment. UMass’s Grady admitted having already received CIS’s Mruk’s letter dated October 26, 1988, which included three copies of an assignment agreement, but denied the effectiveness of that correspondence as a notice of assignment because (a) it was not signed, (b) it named a different party [“The Chicago Corporation”] as assignee, and (c) it indicated only an intention to assign the lease. It was not until September of 1989 that UMass concedes it received a “proper” notice of assignment, from Chi- *535 Corp, although UMass admits having “honored” the assignment as early as December of 1988, when Grady instructed the UMass Accounts Payable Department to start sending lease payments to ChiCorp.
ChiCorp’s position is that there is no evidence to support which month the “missing” payment was applicable to. The first payments ChiCorp received under the lease were those paid to it by UMass from January to June 1989. Since UMass did not designate which months those payments were applicable to, ChiCorp applied them in the order received to the oldest receivables on its books under the assigned lease, Le„ beginning with the November 1988 installment. From August 1989 through February 1990, UMass reverted to making payments under the lease to CIS and again did not designate which month the payments were for; of those payments, the ones that CIS subsequently paid over to ChiCorp were likewise applied by ChiCorp in the order received to successive months of service.
Regarding the notice of assignment, ChiCorp argues that (1) notice of assignment in any form is adequate if it alerts the obligor that another party has acquired the right to receive the obligor’s performance; (2) any ambiguity in the October 26, 1988 letter from CIS’s Mruk to UMass’s Grady was resolved when Grady telephoned Mruk and confirmed the identity of the actual assignee (ChiCorp); and (3) UMass waived the inadequacy of the notice of assignment when it proceeded to make payments to ChiCorp before receiving what UMass itself concedes was “proper” notice, in September 1989.[16]
When an account is assigned, an account debtor is authorized to continue to pay the assignor until the account debtor receives notification[17] that the amount due or to become due has been assigned and that payment is to be made to the assignee. G.L.c. 106, Sec. 9-318(3). An account debtor that makes payments to and for the account of the assignor after receiving notice of the assignment is liable to the assignee. Framingham Welding and Engineering Corporation v. Bennie Cotton, 361 Mass. 866, 867 (1972).[18]
A notice of assignment that does not reasonably identify the right(s) assigned is ineffective. G.L.c. 106, Sec. 9-318(3). In the notice, the obligee must manifest an intention to transfer his right(s) to another person without further action or manifestation of intention by the obligee.[19] Restatement, Second, Contracts Sec. 324. The assignment of a right to payment expected to arise out of an existing business relationship is effective in the same way as an assignment of an existing right. Restatement, Second, Contracts Sec. 321(1).[20] See Bergson v. H.P. Hood & Sons, 300 Mass. 340, 343 (1938) (assignment of rights to money to become due in future sustained); see also Great Am. Indem. Co. v. Allied Freightways, Inc., 325 Mass. 568, 571 (1949) (“The existence of the contract by the terms of which something might become due was enough to support the assignment and to make possible a present transfer to the assignee of the right to receive that which might become due”).
In the instant case, ChiCorp’s letter of October 26, 1988 could not serve as a notice of assignment because no assignment occurred until November 11, 1988, because the ostensible notice appended to that letter was neither signed nor dated, and because it named “The Chicago Corporation,” not Chicorp, as the assignee. Moreover, the follow-up telephone conversation between UMass’s Grady and CIS’s Mruk — according to Grady[21] — made it clear that UMass was to ignore the document. It is equally clear that, at least as of December 27, 1988, the date of Grady’s memorandum instructing the UMass Accounts Payable Department to begin making future lease payments to ChiCorp rather than to CIS, UMass had effectively received notice that the right to receive lease payments had been assigned to ChiCorp. By that time, UMass had already made two payments to CIS: one dated November 18, 1988 in the amount of $174,000, covering three months (September, October, and November), and one dated December 12, 1988 in the amount of $58,000, covering one month’s lease payment. Therefore, the first monthly payment that UMass, having received proper notice of assignment, was liable to make to ChiCorp as assignee was the January 1989 installment. The last installment ChiCorp argues it should have received (see below) was the November 1989 installment. ChiCorp acknowledges having received eleven payments under the lease, including the final payment of $271,000 covering one month’s installment and the termination fee.[22] On these facts, the court finds that there is no “missing” payment for which UMass is liable to pay ChiCorp.[23]
2. The $58,000 Rental Payment for the Month of November 1989
ChiCorp argues that UMass is also liable for an additional month’s lease payment for having given less than ninety days’ notice of its intention to terminate the lease, in violation of the explicit terms of the lease. UMass’s letter[24] announcing its intention to terminate the lease as of October 31, 1989 was dated August 23, 1989, le., only sixty-nine days in advance. Therefore, the effective termination date was actually November 30, 1989. UMass contends that here, where the lease does not state that time is of essence, its late termination notice was a “minor matter” and does not justify an additional month’s lease payment. ChiCorp responds that the memorandum UMass received from CIS on July 28, 1989, in which CIS asked all its customers to “please adhere” to the “notice period as set forth” in the lease, confirmed that time was of the essence.
UMass also argues, in the alternative, that, even if time was of the essence, that condition was waived by ChiCorp’s conduct: ChiCorp did not respond to *536 UMass’s termination notice until October 31, the purported termination date. ChiCorp’s response, which took the form of an “invoice and notice” pursuant to the Assignment and Guaranty Agreement between CIS and Chicorp, specifically mentioned three final payments due under the lease: the installments for September and October 1989 and the termination fee “appropriate” for October 31, 1989, i.e. $213,000. UMass argues that this letter constituted a waiver by ChiCorp of the contractual requirement that UMass give ninety days’ notice to terminate. ChiCorp answers that, since its officer, Malecek, was unaware at the time he wrote the letter that UMass’s notice was late, ChiCorp should not be deemed to have released UMass of its contractual duty.
A contractual agreement that “time is of the essence” is binding when not waived by the words or conduct of the parties. Porter v. Harrington, 262 Mass. 203, 207 (1928). See, e.g., King v. Allen, 5 Mass.App.Ct. 868, 869 (1977) (provision waived by conduct); Hazard v. Keefe, 3 Mass.App.Ct. 775, 776 (1975) (same). It is generally a question of fact whether there has been a waiver of contractual stipulations. Such a finding cannot be pronounced without sufficient support in the evidence. Porter v. Harrington, supra, 262 Mass. at 208 (1928). In Porter v. Harrington, supra, 262 Mass. at 207-08 (1928), where the defendants accepted the plaintiffs long overdue payments for nearly three years, the court ruled: “When a party without objection has accepted overdue payments not made in accordance with the strict terms of the contract, an order of business has been established inconsistent with rigid insistence upon a [penalty] clause . . . [T]he conduct of the defendants was such as to lull the plaintiff into a justifiable assumption that, notwithstanding the terms of the contract, he would be given indulgence in making his payments, and . . . amounted to a waiver of [the defendants’] right” [to exact a penally]. Id. at 208. See also Church of God in Christ, Inc. v. Congregation Kehillath Jacob, 370 Mass. 828, 834-35 (1976) (once obligee has accepted payments after default or waived condition of payment, condition can be recreated only by definite notice providing debtor reasonable time to make up past deficiency).
A contract can be modified only before a breach has occurred, George H. Ferreira Const. Co. v. Pinho, 28 Mass.App.Dec. 135 (1963), and modifications must be supported by valid consideration. TriCity Concrete Co. v. L.A. Const. Co., 343 Mass. 425 (1962). See also Commonwealth Inv. Co. v. Fellsway Motor Mart, 294 Mass. 306 (1936) (written contract may be varied before breach by oral agreement on sufficient consideration). A change in contractual obligations requires the mutual consent of both parties to the contract. New England Mutual Life Ins. Co. v. Harvey, 82 F.Supp. 702 (D.Mass. 1949). An agreement to modify a contract need not be express, however, and may be inferred from attendant circumstances and the conduct of the parties. A. Leo Nash Steel Corp. v. Southern New England Steel Erection Co., Inc., 9 Mass.App. 377 (1980). See also Boston Helicopter Charter, Inc. v. Agusta Aviation Corp., 767 F.Supp. 363 (D.Mass. 1991) (waiver implied by parly’s conduct must be unequivocal and allow room for no other explanation).
Here, UMass concededly breached its contractual obligation to provide ninety days’ notice of its intention to terminate the lease. While ChiCorp’s letter in response arguably released[25] UMass of its duty to provide ninely days’ notice, no modification or “waiver” of the condition was possible once the breach had already occurred and in the absence of consideration.
Nevertheless, UMass does not owe ChiCorp a lease installment for the month of November 1989. As noted ante, there is no evidence to establish that UMass received adequate notice of the assignment of the lease to ChiCorp before December 27, 1988, so the first installment under the assigned lease due to be paid by UMass to ChiCorp was the January 1989 installment. The eleven installments that ChiCorp concedes having been paid under the lease cover the period extending through November 1989, the month at issue here. Therefore, the court finds that, whether or not UMass was at fault in giving late notice of its intention to terminate the lease, UMass is not liable to ChiCorp for an additional monthly installment.
3. The Interest Due for Late Payments
ChiCorp also contends that UMass owes it interest for late payments under the lease. The lease states that monthly lease payments should be made in a “timely manner” and that any payment past due more than thirty days is subject to a 1.5% per month interest penalty.
According to the schedule of payments received by ChiCorp (stipulated exhibit 22), ChiCorp received a lease payment of $58,000 on each of the following dates: #1, January 3, 1989; #2, January 23, 1989; #3, March 6, 1989; #4, April 7, 1989; #5, May 9, 1989; #6, May 30, 1989; #7, June 20, 1989; #8, August 29, 1989; #9, October 2, 1989; #10, October 10, 1989.
In addition, on February 26, 1990, ChiCorp received a “lump sum payment” of $271,000 (#11). The check stub[26] for this last payment designated that the amount paid was the total of one payment for $58,000 and one for $213,000.
ChiCorp identifies the first ten payments it received as applicable to the months of November 1988 through August 1989.[27] As discussed earlier, however, UMass was not liable to begin making lease payments to ChiCorp-as-assignee until January 1989, since there is no evidence that UMass received notice of the assignment of the lease to ChiCorp before December 27, 1988, and UMass had already made a monthly payment to CIS on December 12. Therefore, the eleven payments received by ChiCorp should properly be applied to the months of January through November *537 1989. Thus applied, the payments received on the dates indicated were all timely except for the final payment, le., the one received February 26, 1990, which was overdue with respect to the November 1989 installment.
As noted above, that final payment included an additional $213,000, the amount of the fee keyed to a termination date at the end of October. Hence, not only did ChiCorp receive lease payments through November 1989, it also collected a (higher) termination fee, keyed to a month earlier. (The fee for terminating at the end of November was $205,000.)
On these facts, the court finds that UMass does not owe ChiCorp interest for late payments under the lease.[28]
4. The Fair Market Value of the Leased Telephone Equipment
Finally, ChiCorp claims that UMass is liable to it for the fair market value of the leased equipment, which UMass, after receiving notice of the assignment of the lease by CIS to ChiCorp, allowed to be returned to CIS’s designee. UMass defends its action by arguing that, given the absence of language in the assignment agreement assigning the actual equipment, the assignment of the lease did not constitute an assignment of the equipment. ChiCorp argues that, because it was assigned all CIS’s right, title, and interest in and to the lease, including all payments relating to options to purchase, it (ChiCorp) had a right to the equipment’s return; and that, by returning the equipment to CIS’s designee, UMass failed to discharge its obligations under the lease to ChiCorp.
It is well established that an assignee of contract rights stands in the shoes of the assignor. The assignee’s rights are subject to all the terms of the contract between the account debtor and the assignor and to any defenses or claims arising therefrom. See Dyer v. Homer, 39 Mass. 253 (1839); Earnshaw v. Wittemore, 194 Mass. 187 (1907); Butterick Lumber Co. v. Collins, 202 Mass. 413 (1909); G.L.c. 106 Sec. 9-318(1).
Here, the original lease between CIS and UMass stipulated that, while UMass had the option of purchasing the equipment for its fair market value, title to the lease equipment remained in the name of the lessor, CIS. UMass did not exercise its option to purchase. Subsequently, UMass received notice that CIS had assigned the lease to ChiCorp. That assignment spelled out that CIS had assigned to ChiCorp “all right, title and interest... in and to that certain Equipment Lease/Purchase Agreement . . . and all rights of the Assignor to receive any and all payments of principal and interest payable pursuant to the Agreement . . . and any and all amounts relating to options to purchase.” UMass also received two additional notices from ChiCorp, dated October 19 and October 31, 1989, instructing UMass not to return the equipment to CIS without written authorization from “ChiCorp as Assignee.”
On these facts, the court can discern no basis of support for UMass’s Grady’s “understanding” that ownership of the leased equipment remained with CIS and that the assignment between CIS and ChiCorp extended only to the right to receive payments and not to the right to the return of the equipment. Therefore, the court finds UMass liable to ChiCorp for the fair market value of the leased equipment that UMass— after receiving notice of the assignment of the lease to ChiCorp — allowed to be delivered to CIS.
ORDER
For the reasons discussed above, it is hereby ORDERED that plaintiff ChiCorp’s motion be DENIED IN PART as to defendant UMass’s liability for (1) a “missing” monthly payment of $58,000; (2) a payment of $58,000 to cover service under the lease for the month of November 1989; and (3) interest for late payments under the lease. Plaintiff ChiCorp’s motion is ALLOWED IN PART as to defendant UMass’s liability for the fair market value of the leased telephone equipment. It is further ORDERED that defendant UMass’s motion be ALLOWED IN PART as to its non-liability to plaintiff ChiCorp for (1) a “missing” monthly payment of $58,000; (2) a payment of $58,000 to cover service under the lease for the month of November 1989; and (3) interest for late payments under the lease. Defendant UMass’s motion is DENIED IN PART as to its non-liability for the fair market value of the leased telephone equipment.
It is further ORDERED that the Clerk of Courts set down this matter for a damage assessment hearing.

 These facts are based on the “Undisputed Issues of Fact” section of the parties’ Joint Pre-Trial Memorandum and on the forty-three exhibits to whose authenticity and admissibility both parties have stipulated.

 The lease explicitly provided for the assignment of the lease by CIS, effective upon notice to the lessee, UMass. All notices under the lease were to be in writing, using registered mail with return receipt; notice was to be deemed received upon return of the receipt.

 The amount of the termination fee depended upon the date of termination. For the two dates of relevance here, the fees were as follows:
termination date termination fee
10/31/89 $213,000
11/30/89 $205,000

 “The Chicago Corporation” is wholly owned by the same parent company that wholly owns plaintiff ChiCorp.

 Grady was deposed on November 14, 1991.

 From August 1989 through February 1990, however, UMass reverted to making payments to CIS. In his deposition, Grady explained how, “as a matter of course,” this might have happened: When the lease was originally generated, a purchase order was created for a payment schedule to CIS. At the end of the fiscal year, when the purchase order was *538 renewed, payments on the lease to CIS were resumed, ignoring the interim period of payments made to ChiCorp.
Grady’s “understanding” is that these payments made to CIS were subsequently paid over by CIS to ChiCorp.

 Grady did not send the notice to the new address that CIS had instructed its customers to use for such notifications.

 Grady’s letter notifying CIS of UMass’s intention to terminate the lease was not copied to ChiCorp.

 Malecek’s letter to UMass was copied to CIS.

 Grady said he allowed the equipment to be returned to CIS because he “felt” that ownership of the equipment, as set out in the lease, remained with CIS as lessor.

 The check stub identified the amount as the sum of two payments received from UMass: one for $58,000 and one for $213,000.

 Although ChiCorp at one time assigned its interest in the lease to Bridgeview Bank & Trust and Marquette National Bank, ChiCorp subsequently took reassignment of all the banks' interest in the lease.

 ChiCorp computes the total of the first two obligations (2 x $58,000) at $108,000, not $116,000, taking into account the $8,000 difference between the termination fee actually paid by defendant UMass ($213,000) and the termination fee ChiCorp asserts UMass should have paid ($205,000).

 UMass asserts that it made this payment to CIS, but that CIS never paid it over to ChiCorp.

 As noted ante, UMass sent lease payments to ChiCorp from January through June of 1989.

 A person has “notice” of a fact when (a) he has actual knowledge of it; or (b) he has received a notice or notification of it; or (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists. G.L.c. 106, Sec. 1-201(25). A person “notifies” or “gives" a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course, whether or not such other actually comes to know of it. A person “receives” a notice or notification when (a) it comes to his attention; or (b) it is duly delivered at the place of business through which the contract was made or at any other place held out by him as the place for receipt of such communications. G.L.c. 106 Sec. 1-201(26). Notice, knowledge or a notice or notification received by an organization is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that transaction, and in any event from the time when it would have been brought to his attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines. G.L.c. 106, Sec. 1-201(27). See also 6 Am.Jur.2d, Assignments, Sec. 98 (2d ed. 1963).

 Likewise, the assignor retains his power to discharge the duty of the obligor to the extent the obligor performs, but not after the obligor receives notification that the right has been assigned and that performance is to be rendered to the assignee. Restatement, Second, Contracts Sec. 338(1).

 The manifestation may be made to the other or to a third person on his behalf and, except as provided by statute or by contract, may be made either orally or by a writing. Restatement, Second, Contracts Sec. 324.

 Compare Restatement, Second, Contracts Sec. 330(1): A contract to make a future assignment of a right, or to transfer proceeds to be received in the future by the promisor, is not an assignment.

 UMass’s Grady presented his account of the telephone conversation during the deposition conducted on November 14, 1991, the transcript of which comprises one of the forty-three stipulated exhibits. ChiCorp did not submit an affidavit from CIS’s Mruk.

 As discussed below, there is a dispute between the parties regarding the correct amount of the termination fee. According to ChiCorp, UMass’s effective date of termination was November 30,1989, and the termination fee UMass owed was $205,000. The $8,000 difference between the final payment of $271,000 that ChiCorp received from UMass via CIS and the sum of the termination fee ChiCorp expected plus one month’s lease payment of $58,000 was, as noted ante, note 14, taken into account by ChiCorp in computing the total ($108,000) of the two installments it claims to be missing. According to UMass, the $271,000 payment was meant to cover one monthly installment of $58,000 plus the termination fee of $213,000 keyed to its intended termination date, October 31, 1989.

 Because the court has decided the issue of UMass’s liability for this installment payment on the basis of ChiCorp’s failure to provide UMass with timely notice of assignment, the court need not reach the parties’ arguments regarding the statute of limitations.

 As noted ante, UMass’s termination notice was sent to CIS, not ChiCorp.

 Strictly speaking, ChiCorp cannot be said to have “waived” UMass’s obligation to provide ninety days’ notice, since a party can waive a condition only if that party is the one that owes the duly subject to the condition. For example, where the duty of a party to purchase real property is conditional on his obtaining a mortgage, that condition can be waived by the purchaser but not by the vendor. II Farnsworth on Contracts, Sec. 8.5 at 374, n. 6 (1990). Here, it was UMass’s own duty to pay for an additional month’s service under the lease that was subject to the condition that it provide ninety days’ termination notice. ChiCorp had no duty subject to the condition.

 The stub is included in stipulated exhibit 21.

 ChiCorp does not identify the applicability of the lump sum payment received on February 26, 1990.

 It is also worth noting that at no time during the life of the lease did ChiCorp ever invoice UMass for interest due for all the payments ChiCorp claims were late. It was not until after the lease had been terminated that the subj ect of interest arose.

 UMass is the State University of the Commonwealth of Massachusetts; the relevant entity in this case is the University of Massachusetts Medical Center, located in Worcester.